**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Performance Insurance Company SPC,                Chapter 15

Debtor in a Foreign Proceeding.                Case No. 21-12609 (AJC)

**OPPOSITION OF LEXINGTON INSURANCE COMPANY TO MOTION TO COMPEL**
**TURNOVER OF FUNDS HELD AT KEYBANK NATIONAL ASSOCIATION**

Lexington Insurance Company ("Lexington"), an insurance company that is an indirect, wholly owned subsidiary of American International Group, Inc. ("AIG, Inc." and, together with Lexington and other related entities, "AIG"), by and through its counsel, respectfully submits this objection to the Joint Liquidators (the "Foreign Representatives" or the "JOLs") of Performance Insurance Company SPC's (the "Debtor" or "Performance") *Motion to Compel Turnover of Funds Held at KeyBank National Association* [ECF No. 23] (the "Motion to Compel") seeking an order directing KeyBank National Association ("KeyBank") to turn over the funds in a bank account held by Goldenstar Holdings Company SP ("Goldenstar Holdings") pursuant to section 1521(a)(7) of Title 11 to the United States Code (the "Bankruptcy Code"),[1] and respectfully states as follows:

**SUMMARY OF THE OBJECTION**

1.    This bankruptcy case stems from the Debtor's participation in a scheme to sell counterfeit insurance policies and defraud the public.  The Foreign Representatives' request should

---

[1]    Terms not otherwise defined herein shall have the meaning given to them in the Motion to Compel.

be denied because they are trying to obtain control and ownership over money that was the fruit of a fraudulent scheme that defrauded both AIG and thousands of policyholders and that cannot be a part of the bankruptcy estate.  Turnover here would sanction the Foreign Representatives taking money that was stolen from policyholders who were duped by Debtor and its partners in crime into buying fraudulent policies that were issued on Lexington's paper without Lexington's permission or approval.  The money in question is the premium that was collected in the fraudulent scheme; as such, it is not a part of the Debtor's estate.  Indeed, Performance and its co-conspirators acknowledged in Kentucky District Court that this money should be used for the sole purpose of satisfying any claims made by those policyholders and agreed to Consent Orders that expressly established that the money could only be used for that purpose.  The Foreign Representatives are now disregarding the Consent Orders by attempting to take control of that money and are asking this Court to disregard both the Consent Orders and Performances' previous agreements.  Moreover, the Motion to Compel should have been brought before the Foreign Representatives attempted to obtain the money from KeyBank, not after.

2.      The Debtor is a segregated portfolio company based in the Cayman Islands that was used to perpetrate the fraudulent scheme on policyholders located throughout the United States (and on AIG). The fraudulent policies and the individual certificates issued thereunder purport to insure thousands of sports teams and leagues (mostly in youth sports) and an exponentially larger number of individual athletes. Some of the fraudulent accident and health policies—for combat sports and football—have million-dollar limits for certain brain injuries, and some of the fraudulent general liability policies have limits up to $4,000,000. Every insured was under the impression that, if a loss occurred, Lexington would pay the claim. In fact, however, every policy at issue was a counterfeit, and claims would be paid only if the fraudsters decided to pay them.  The Foreign Representatives

seek access to funds currently held in the Debtor's bank account at KeyBank with account ending XXX1886 (the "KeyBank Account"). Those funds were at the center of the fraudulent scheme, and case law has long held that (i) funds obtained by a debtor through means of fraud are not property of the debtor, and (ii) stolen property cannot be used to benefit the debtor's bankruptcy estate.

3.      The Debtor's conduct is plainly unlawful. It has violated the Lanham Act, which imposes the harshest punishments in counterfeiting schemes like those here, as well as federal trademark law, state unfair competition law, and criminal liability. It has also given rise to claims for relief filed by policyholders under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various state and common law claims, as described below.

4.      To that end, on May 11, 2020, Lexington filed a complaint (the "Complaint") and contemporaneously sought a temporary restraining order ("TRO")[2] in the United States District Court for the Western District of Kentucky styled *Lexington Insurance Company v. The Ambassador Group LLC, et al*, case no. 20-00330 (JRW) to put an end to Debtor's and Debtor's co-defendants' ongoing and brazen fraud scheme [KY Dkt. No. 1] (the "Kentucky Litigation"). In the Kentucky Litigation, the Kentucky District Court entered two consent orders, one in May 2020 [KY Dkt. Nos. 16, 17] and the other on October 13, 2020 [KY Dkt. No. 62] in response to requests for injunctive relief (collectively the "Consent Orders")[3] directed at the Debtor. The Consent Orders directly address the maintenance and use of fraudulently obtained funds of the Debtor, including funds in the KeyBank Account, held within various segregated portfolios (the "Consent Order Accounts"). Among other

---

[2]      Reference is made hereinafter to the Declaration of Joseph Davina, the Vice President of AIG Captive Solutions, a division of AIG ("Davina Decl."), attached hereto as **Exhibit A**, and the Declaration of Adam J. Kaiser, co-counsel to Lexington ("Kaiser Decl."), attached hereto as **Exhibit B**, filed in support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction in the Kentucky Litigation.

[3]      Attached hereto as **Exhibit C** is a true and correct copy of the Agreed Order [KY Dkt. No. 16] and Order Following Telephonic Hearing [KY Dkt. No. 17] (together, the "May Consent Order"). Attached as **Exhibit D** is a true and correct copy of the Consent Order to maintain the Status Quo [KY Dkt. No. 62] ("October Consent Order").

LEGAL02/40759043v6

things, to ensure that the defrauded policyholders are returned their money, the Consent Orders provide (in paragraph 5 of each order) that the Debtor "shall not transfer, diminish or dissipate" funds in the Consent Order Accounts "other than to adjust, pay or settle claims made by policyholders and certificate holders in the normal course."  May Consent Order at ¶ 5.

5.    Pursuant to the Consent Orders, the Debtor continued administering claims through its third-party administrator ("TPA"), Health Special Risk, Inc. ("HSRI").  The program ran smoothly from September through sometime in December 2020, as the payment of claims filed against the counterfeit policies were paid from the premiums collected by the fraudsters and housed at the KeyBank Account.  However, in November 2020, two defendants in the Kentucky Litigation, Gagliardi Insurance Services, Inc. ("Gagliardi") and Goldenstar Specialty Insurance, LLC ("Goldenstar Specialty"), filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of California, case nos. 20-51629 and 20-51659, respectively.  Shortly thereafter, HSRI stopped administering claims, and payments ceased.  In other words, although the Consent Orders required otherwise, the administration and payment of claims stopped after HSRI's resignation and the Goldenstar and Gagliardi bankruptcy filings.

6.    Once claims were ignored, the purchasers of the counterfeit policies took little time in filing a class action suit against the Debtor and its co-defendants in the United States District Court, Central District of California, Southern Division on January 28, 2021 styled *Del Obispo Youth Baseball, Inc. v. The Ambassador Group LLC et al*, case no. 21-00199 (JVS) (the "Class Action").

7.    In January and February 2021, in order to effectuate the Consent Orders in light of the departure of HSRI, Gagliardi and Goldenstar that had been administering and paying claims, the Debtor's U.S. counsel was negotiating with plaintiffs in the Kentucky Litigation to enter into another consent order in which (i) the District Court in Kentucky would appoint a special master who would

4

be empowered to hire a new TPA and pay claims and (ii) the approximately $2.4 million in the segregated KeyBank Account would be controlled by the special master under the supervision of the Kentucky District Court. After agreeing on basic terms and who the special master would be, plaintiffs were exchanging drafts of the new consent order with the Debtor—until the Debtor had a change of heart. Instead of finalizing the new consent order, which would have placed the $2.4 million from the KeyBank Account under court supervision, Performance placed itself into voluntary liquidation (the "Cayman Proceeding"). That change of heart occurred shortly after the Kentucky Court denied Performance's motion to dismiss for lack of personal jurisdiction. Opinion and Order [KY Dkt. No. 103] ("MTD Order"), attached hereto as **Exhibit E**.

8.      By initiating the Cayman Proceeding and petitioning for Chapter 15 bankruptcy (the "Chapter 15 Case"), the Debtor sought to further its fraud by taking advantage of the bankruptcy process with the ultimate goal of (a) thwarting (indeed nullifying) the Consent Orders and thereby harming the defrauded policyholders by taking control over funds that by dint of the Consent Orders were to be to pay claims, (b) avoiding any new deal that would put the $2.4 million held in the KeyBank Account (and other segregated cell funds) under the supervision of a U.S. court for the policyholders' benefit, and (c) taking control for itself over the segregated cell money in the KeyBank Account and presumably the other Consent Order Accounts to the harm of the policyholders.

9.      Anticipating a contested recognition hearing after filing the Chapter 15 Case, the Foreign Representatives for Performance negotiated with Lexington and the other Kentucky Action plaintiffs and *stipulated that the Consent Orders (which have the goal of ensuring that defrauded policyholders are repaid) would remain in place* in the Chapter 15 Case and the status quo would be upheld until this Court determines otherwise. Importantly, as set forth more fully below, the Order Granting Recognition of Foreign Main Proceeding Pursuant to §§ 1515 and 1517 of the Bankruptcy

Code and Granting Related Relief [ECF No. 17] (the "Recognition Order") *specifically contemplates* that the fraudulently obtained funds of the Debtor located in various segregated cells, including the KeyBank Account, will remain undisturbed until the Foreign Representatives, after notice and hearing, have sought and obtained consent of this Court to do anything else with that money.  In seeking to unilaterally obtain funds held in the KeyBank Account before filing the Motion to Compel, the Foreign Representatives violated the Recognition Order and the procedures set forth therein.

10.    For all of these reasons, the Motion to Compel should be denied.  The Bankruptcy Code, along with a myriad of other federal and state laws, specifically authorizes this Court to enforce the Consent Orders, to issue additional appropriate injunctive relief, including the implementation of a constructive trust, and to protect the defrauded policyholders' funds from being misused by the Foreign Representatives for the benefit the Debtor and its estate rather than to pay their claims.

## STATEMENT OF FACTS

### A.    AIG's Business Relationship with Debtor – "Captive Reinsurance"

11.    AIG, Inc. is a publicly owned holding company. Its numerous subsidiaries and operating companies provide a diverse range of property and casualty insurance, life insurance, retirement products, mortgage insurance, and related financial services to its customers and clients. Davina Decl. at ¶ 1.

12.    Lexington is an indirect, wholly owned subsidiary of AIG, Inc. that has operated as an excess and surplus line insurance company for more than 50 years. Lexington is one of the largest excess and surplus lines carriers in the United States. Complaint at ¶¶ 24-25.

13.    Lexington had (through AIG) an existing business relationship with The Ambassador Group LLC d/b/a Ambassador Captive Solutions ("Ambassador") and one of Ambassador's principals, Brandon White ("White") who were the architects of the fraudulent

scheme. The fraud relates to an area of insurance known as "captive reinsurance." Captive reinsurance programs are complex multi-party arrangements that require specialized expertise and significant underwriting capacity. Performance served as the captive reinsurer, established and located in the Cayman Islands, and Goldenstar Holdings, served as a segregated cell of Performance, in which the KeyBank Account and other accounts are held. Davina Decl. at ¶ 15.

14.    In the type of captive reinsurance program at issue here, an insurance broker or other company (the "Broker/Owner") forms and owns a captive reinsurance company (the "Captive"). The Captive is ultimately responsible for paying some or all of the losses on policies sold by the Broker/Owner. Davina Decl. at ¶ 4.

15.    Because Captives are not licensed direct insurers, the Broker/Owner must engage a commercial insurer (such as Lexington) (an "Issuing Carrier") to issue the insurance policies to be sold and then reinsure such policies to the Captive. The apportionment of risk between the Issuing Carrier and the Captive is typically documented in a reinsurance agreement through which the Captive (as the reinsurer) agrees to reimburse the Issuing Carrier for some or all of the losses incurred under the policies. Davina Decl. at ¶¶ 5-6.

16.    These complex transactions are often facilitated by a "Captive Intermediary," an entity that assists a Broker/Owner in developing an actuarial model and business plan, forming the Captive, and—most importantly—identifying an Issuing Carrier to issue the policies to be sold by the Broker/Owner and reinsured to the Captive. Davina Decl. at ¶ 8. Ambassador is such a Captive Intermediary, founded by White in 2011 in Louisville, Kentucky. Complaint at ¶ 33.

**B.    Ambassador Solicits Lexington's Participation in the Gagliardi Fraud**

17.    In early 2018, White contacted AIG to see if AIG would be interested in working with Ambassador on captive reinsurance programs. He explained that QBE Insurance Group, Ltd.

("QBE") was the carrier for most captive arrangements in Ambassador's portfolio, but that Ambassador was looking for a change, and was interested in moving its entire captive portfolio to AIG.  Davina Decl. at ¶ 12.

18.     In June 2018, AIG executives met in Louisville with White and others at Ambassador to discuss such opportunities. Following that meeting, an AIG-affiliated insurer (not Lexington) agreed to act as the Issuing Carrier for two different group captive programs in Ambassador's portfolio. Throughout 2018 and 2019, AIG regularly communicated with White and his Ambassador colleagues regarding these two group captive programs, including two additional in-person meetings with White.  Davina Decl. at ¶¶ 13-14.

19.     In August 2018, White solicited AIG to act as the Issuing Carrier for a different captive program in Ambassador's portfolio—a captive reinsurance program involving policies that would be sold by a broker, Gagliardi Insurance Services, Inc. ("Gagliardi"), which served as the insurance broker in the fraudulent scheme (the "Gagliardi Insurance Program"). White and Ambassador explained that the Gagliardi Insurance Program would provide accident and health coverage for various youth and professional sports teams and leagues. As part of the Gagliardi Insurance Program, Ambassador created Goldenstar Holdings, a segregated portfolio of the Debtor, ultimately owned by Gagliardi Insurance and based in the Cayman Islands, to serve as a captive reinsurer. Goldenstar Holdings is owned by Gagliardi Insurance, so Gagliardi Insurance is the Broker/Owner, and Goldenstar Holdings is the Captive.  Davina Decl. at ¶ 15.

20.     The Gagliardi Insurance Program contemplated the execution of a Managing General Agent Agreement ("MGA Agreement") or Program Administration Agreement ("PA Agreement"), under which Gagliardi Insurance would have the ability to issue policies in the name of the AIG-affiliated insurer serving as the Issuing Carrier.  Davina Decl. at ¶ 17.

21.    AIG determined that it was not interested in the Gagliardi Insurance Program, and, in October 2018, AIG advised White that it declined to participate. White asked AIG several more times over the following months to revisit the opportunity. Each time, the answer was the same: AIG declined the program.  Davina Decl. at ¶¶ 22-23.

C.    **Ambassador and White Orchestrate the Fraud and Lie to Cover it Up**

22.    Undeterred by AIG's repeated refusal to be involved in the Gagliardi Insurance Program, White, Ambassador, and Goldenstar (and maybe others) involved themselves in a scheme to forge documents and issue counterfeit policies in Lexington's name as if AIG had accepted and not declined the program. Complaint at ¶¶ 181-191.

23.    White repeatedly lied to AIG to cover up the fraud scheme. In December 2018, for example, HSRI (the TPA) emailed Davina requesting to move forward with the TPA agreement for the Gagliardi Insurance Program, believing that the Gagliardi Insurance Program went into effect with Lexington as the Issuing Carrier on July 1, 2018.  Davina Decl. at ¶ 26, Ex. 1.  Davina immediately questioned White about the email because AIG's affiliated companies had repeatedly declined to serve as the program's Issuing Carrier.  *Id*. at ¶ 27, Ex. 1.  White deliberately misled Davina, stating that HSRI's email was just a miscommunication "on the client side," and he asked Davina not to call HSRI.  *Id*. at ¶ 28, Ex. 1.  In fact, however, HSRI contacted Davina because White misled HSRI into believing that Lexington was the Issuing Carrier.

24.    A week later, White fabricated an email purporting to be from Davina's AIG email account to White and another Ambassador principal, Darin Smith.  Davina Decl. at ¶ 29.  In the fabricated email, Davina appeared to grant "conditional approval" on AIG's behalf for HSRI to manage claims until AIG formally approved HSRI. *Id*. at ¶ 30, Ex. 2. White sent the fake email to HSRI conveying what appeared to be AIG's green light for HSRI to proceed as the TPA; this was

part of White's ruse to mislead HSRI that Lexington was the Issuing Carrier. *See id*. HSRI (believing the email to be genuine) forwarded the fabricated email to Davina, who confronted White and Smith about it. *Id*. at ¶ 31, Ex. 2. Smith denied any knowledge of the fabricated email and vowed to get to the bottom of it. *Id*.

25.    In January 2019, White met Davina at AIG's office in New York to discuss, among other things, the two group captive arrangements for which another AIG company (not Lexington) was acting as the Issuing Carrier. Davina Decl. at ¶ 32. During that meeting, Davina again inquired about the fabricated email purportedly sent from his email account. *Id*. White assured Davina that no one from Ambassador was involved in the fabrication and that Ambassador and would never engage in such conduct. *Id*. That was a lie; Ambassador created the fake email to trick HSRI into believing that Lexington was the Issuing Carrier and that Lexington had agreed to have HSRI serve as the TPA.

26.    The deception continued. In February 2019, Goldenstar Holdings' insurance manager, Atlas Insurance Management ("Atlas"), emailed Davina seeking language for Goldenstar Holdings' letter of credit, which ostensibly was to serve as AIG's collateral for the Gagliardi Insurance Program. Davina Decl. at ¶ 33, Ex. 3. Davina asked White why AIG was continuing to receive correspondence about the Gagliardi Insurance Program that AIG's affiliated companies declined to underwrite. *Id*. at ¶ 34, Ex. 3. White misled Davina once more, passing Atlas' email off as a "miscommunication on the clients [sic] part and messaging from the captive." *Id*. White apologized that AIG kept "getting tagged" with emails concerning the Gagliardi Insurance Program. *Id*.

27.    Also, in February 2019, Helmsman Management Services ("Helmsman") emailed Davina introducing itself as the new TPA for the Gagliardi Insurance Program. Davina Decl. at ¶

35, Ex. 4.  When Davina replied to Helmsman that no AIG-affiliated insurance carrier was the carrier for the Gagliardi Insurance Program, Helmsman provided Davina with an unsigned draft of a facultative reinsurance agreement between Goldenstar Holdings and Lexington.  *Id*. at ¶ 36, Ex. 4.  Davina forwarded the draft agreement to White to find out what was going on.  *Id*. at ¶ 37, Ex. 4.  White misled Davina yet again, responding that it was a draft based on a template that AIG provided him earlier in the year but that ***"[t]his is not an agreement with Lexington***" and that the unsigned agreement was "***not in effect, obviously***."  *Id*. (emphasis added).

> **D.**     **Lexington Discovers the Forged Reinsurance Agreement; Ambassador's and White's Lies are Exposed**

28.    Ambassador and White went to great lengths to hide their fraud and were successful in their deceit—until they got caught. At every turn, White and Ambassador concealed their fraud by assuring AIG (in writing, no less) that the policies sold by Gagliardi Insurance had been issued by another commercial carrier, and not by Lexington. The fraud was finally exposed when one claims administrator sent AIG a copy of one of the transaction documents White had forged (or caused to be forged) to purportedly bear Davina's signature. At that point, the jig was up.

29.    On November 19, 2019, Atlas emailed Davina (copying Ambassador) a "fully executed Facultative Reinsurance Agreement" with a signature purporting to be Davina's on Lexington's behalf dated August 17, 2018 (the "Forged Reinsurance Agreement").  Davina Decl. at ¶ 38, Exs. 5, 6. Atlas, apparently believing that Lexington was the Issuing Carrier, requested wiring instructions for Lexington's "commission payment."  *Id*. at ¶ 40, Ex. 6.  The signature on the Forged Reinsurance Agreement is not Davina's.  *Id.* at ¶ 39.

30.    Davina demanded that White explain the forgery of his signature.  Davina Decl. ¶ 41, Ex. 6. Once caught, White and Ambassador admitted that Davina's signature was forged, although they professed to have no knowledge as to who had forged the signature, or why, as they

continued to claim that Lexington was not involved with this insurance program. White lied to Davina again, apologizing for the ***"misrepresentation"*** and assuring Davina that the forged contract ***"did not come from Ambassador in any way."*** *Id*. ¶ 42, Ex. 6 (emphasis added). White, claiming that he too was baffled by the forgery, informed Davina that he was "***working to track down the genesis of [the] document***" and promised to "***get to the bottom***" of it. *Id*. (emphasis added). Notably, White did not at that time claim that Davina had signed the Forged Reinsurance Agreement or that it was an otherwise legitimate document. *See id.* at Ex. 6. To the contrary, White fessed up that it was a forgery, claimed ignorance of the document's origin, and vowed to unearth the truth.

### E.    Lexington Discovers the Counterfeit Insurance Policies Bearing the Lexington Mark

31.    After discovering the Forged Reinsurance Agreement, Lexington began investigating whether anyone was using the Forged Reinsurance Agreement to support an actual captive reinsurance program. Complaint at ¶ 59. The details of the investigation are set forth in the Kaiser Declaration submitted as **<u>Exhibit B</u>** herewith. Among other things, Lexington (through counsel) sent letters to every potential participant in the Gagliardi Insurance Fraud seeking documents and an opportunity to discuss the facts. Notably, Gagliardi Insurance refused to discuss the matter with Lexington.

32.    In connection with that investigation, on February 7, 2020, Ambassador (through counsel) claimed, among other things, that White witnessed Davina sign the Forged Reinsurance Agreement on May 9, 2019 and backdate it to August 17, 2018.  Kaiser Decl. at ¶ 10, Ex. 11.  This claim, of course, is utterly inconsistent with White's numerous admissions made in February and December of 2019 that: (1) he was unaware of "the genesis of this document," (2) the agreement "was not in effect, obviously," (3) the agreement was a "misrepresentation," and (4) the agreement

"did not come from Ambassador in any way." *See* Davina Decl. at Exs. 4, 6.  Indeed, when confronted with both the signed and unsigned Forged Reinsurance Agreement, White was adamant that he knew nothing about either of them (*e.g.*, "We are working to track down the genesis of this document. I can assure you that it did not come from Ambassador in any way." (Davina Decl. ¶ 42, Ex. 6)).  Yet, after counsel became involved, White suddenly claimed to recall that Davina signed the agreement after all. This about-face was remarkable, but ultimately pointless: White and Ambassador had admitted their brazen fraud scheme, and their flimsy effort to backtrack on their admissions just exacerbated their lies.

33.    In any event, on March 3, 2020, Ambassador (through counsel) provided copies of 11 accident and health insurance policies that Lexington purportedly issued in connection with the Gagliardi Insurance Program (the "<u>Counterfeit Insurance Policies</u>").  Kaiser Decl. at ¶ 16. Each of the Counterfeit Insurance Policies bears the Lexington Mark.  Complaint at Exs. I-S.  For nine of the 11 Counterfeit Insurance Policies, Gagliardi Insurance is listed as the policyholder (presumably, Gagliardi Insurance would then issue certificates of insurance out of those policies to sports teams and leagues insuring accident and health risks (the "<u>Gagliardi Counterfeit Certificates</u>")).  Complaint at ¶ 70.  The other two Counterfeit Insurance Policies were issued to "Pony Baseball and Softball, Inc." (which supports over 500 youth sports teams) and "NYASA, Inc. dba" (a New York sports federation) as policyholders.  *Id.* at ¶ 71.  All of these sports teams and leagues were misled into believing that they are insured by Lexington when in fact they are not.  *Id.* at ¶ 72.  Lexington never issued these policies—they are outright counterfeits.

34.    Numerous claims (totaling approximately $1,000,000) were made on the Counterfeit Insurance Policies, and while Goldenstar Holdings paid for some of those claims,

many more claimants remain unpaid. Complaint at ¶ 83.[4] Every insured was under the impression that, if a loss occurred, a company affiliated with AIG would be there to pay the claim. In fact, however, *every policy at issue was a counterfeit*, and claims would be paid only if the fraudsters decided to pay them. Davina Decl. ¶¶ 43-44; Complaint at ¶ 2. These policyholders were clearly defrauded—they paid premiums for insurance that they believed was being offered by Lexington but received counterfeit policies instead.

### F.    Lexington Commences the Kentucky Litigation

35.    On May 11, 2020, Lexington filed the Complaint in the Kentucky District Court against the Debtor, Ambassador, White, Gagliardi, Goldenstar Specialty, Goldenstar Holdings, and Smart Insure (collectively, "Defendants"). The Complaint exposed the Debtor's fraud and set forth claims against all Defendants including (i) Counterfeiting and Trademark Infringement, (ii) Indirect Trademark Counterfeiting and Infringement, (iii) Unfair Competition and False Designation of Origin, (iv) Misappropriation of Name, (v) State Law Unfair Competition under various state statutes; (vi) Fraud; (vii) Negligence Per Se; and Declaratory Relief. *See* Complaint at ¶¶ 105–215. The Kentucky District Court granted Lexington's application, on the consent of the Defendants (including the Debtor), for a TRO filed at the inception of the case seeking to freeze the assets in the segregated cells, (including approximately $2.4 million held in the KeyBank Account that is made up entirely of premium money collected by the Debtor from purchasers of counterfeit policies) such that the funds in the cells would be used solely to administer and pay claims of the defrauded.

36.    Subsequently, on May 14, 2020, the May Consent Order was entered in the Kentucky Litigation, which provides, among other things:

---

[4]    This claim amount is "as of" the date the Complaint was filed.  It has increased significantly since then.

> Defendants represent and warrant that more than $6 million in premiums were collected by Goldenstar Holdings Company SP ("Goldenstar") in connection with the Gagliardi Insurance Program and there is now more than $3 million being held in escrow (the "Escrow") to cover any potential claims made in connection with the Gagliardi Insurance Program and that, except as necessary to pay claims in the ordinary course with respect to the Gagliardi Insurance Program, the Escrow will remain in place.

May Consent Order at Pages 2-3.  Recognizing the imminent risk of dissipation of the funds of the defrauded policyholders, paragraph 5 of the May Consent Order provides:

> Defendants, their agents, employees, officers, attorneys, successors, assigns, affiliates, and all persons in privity or in active concert or participation with any of them, shall not transfer, diminish or dissipate the Escrow or other monies received from the sale of any insurance policies bearing the Lexington Mark (as those terms are defined in the Complaint) other than to adjust, pay or settle claims made by policyholders and certificated holders in the Gagliardi Insurance Program in the normal course. Defendants shall provide sufficient documentation concerning the amount and location (e.g., depository institution) of the funds in the Escrow[.]

*Id*. at ¶ 5.[5]

37.    The Kentucky District Court also granted leave to State National Insurance Company, Inc. to intervene in the Kentucky Litigation because it too was a victim of the Defendants' fraudulent counterfeit insurance scheme.  *See* KY Dkt. No. 43.

38.    Pursuant to the May Consent Order, the Debtor continued administering claims through its TPA. On September 22, 2020, counsel to Goldenstar Holdings reached out to Lexington's counsel to convey information about the KeyBank Account pursuant to the anticipated Consent Order. Attached hereto as **Exhibit F** is a true and correct copy of the letter from Goldstar Holdings' counsel, including a copy of the KeyBank Account statement forwarded to Lexington confirming a balance of $2,488,176.23 in the name of Goldenstar Holdings. Notably, Goldenstar Holdings reassured Lexington that every penny of the KeyBank Account funds would be

---

[5]    After the entry of the Consent Orders, AIG learned that, in addition to the accident and health policies and certificates, the fraudsters issued as part of the Goldenstar/Gagliardi fraud thousands of counterfeit general liability certificates bearing the mark of Lexington.

maintained for the purposes of paying claims of the defrauded policyholders upon resolution of the Kentucky Litigation: "The current balance in the Goldenstar Holdings Company is $2,488,176.23. It is Goldenstar Holdings Company's intention to maintain this balance until this matter can be resolved." *Id.*

39.     On October 13, 2020, the Kentucky District Court entered the October Consent Order to provide intervening plaintiffs State National Insurance Company, Inc. and National Specialty Insurance Company (collectively, "State National") with protections for State National that are substantially similar to those afforded Lexington in the May Consent Order.

40.     After both Consent Orders were entered, the Debtor continued to administer claims through its TPA, and the program ran smoothly until Gagliardi and Goldenstar Specialty filed petitions for chapter 7 bankruptcy on November 13th and 20th respectfully (the "Chapter 7 Cases"). As a result, HSRI ceased administering claims and payments to policyholders ceased.

### G.     Policyholders Initiate Class Action Against the Debtor; Defendants' Motion to Dismiss Kentucky Litigation Denied

41.     Subsequently, purported representatives of the defrauded policyholders initiated the Class Action on January 28, 2021 against all defendants in the Kentucky Litigation seeking damages and equitable relief under the Racketeer Influenced and Corrupt Organizations Act, and various state and common law claims [CA Dkt. No. 1] (the "Class Action Complaint"). The Class Action Complaint contains causes of action arising from (i) Racketeer Influenced and Corrupt Organizations Act violations; (ii) Conversion; Unjust Enrichment; (iii) Unfair Competition pursuant to Cal. Bus. & Prof. Code; and (iv) Negligence. Class Action Complaint at ¶¶ 71-109.

42.     After agreeing to the Consent Orders and filing answers to both Lexington's Complaint and State National's Complaint, the Debtor filed a Motion to Dismiss arguing that the Kentucky District Court lacked personal jurisdiction. On February 16, 2021, the Kentucky District

16

Court issued the MTD Order, finding that it has personal jurisdiction over Performance.  *See* MTD Order.  Notably, the Kentucky District Court commented: "The Plaintiffs muster a persuasive argument that Performance's alleged Kentucky connections, involving co-defendant and agent Brandon White, show that Performance took advantage of the Commonwealth's laws and the benefits of doing business here. If true, that would suffice to establish the Court's jurisdiction over Performance." *See* MTD Order at 2.

**H.    The Chapter 15 Case**

43.    Seeking to insulate the KeyBank Account from the reach of the policyholders, on March 19, 2021 (the "Petition Date"), the Debtor commenced the Chapter 15 Case, only one month after the issuance of the MTD Order and approximately five months after entry of the October Consent Order.

44.    On April 15, 2021, the Court entered the Recognition Order. Before  entry of the Recognition Order, the Foreign Representatives along with certain parties in interest, including Lexington, stipulated that in light of the Consent Orders entered by the Kentucky District Court to ensure the status quo and protection of the defrauded policyholders, the Recognition Order should contain the following carveout: "[Foreign Representatives] shall not transfer, diminish or dissipate" funds in the Consent Order Accounts "other than to adjust, pay or settle claims made by policyholders and certificate holders in the normal course."   Recognition Order at ¶ P. Furthermore, the Recognition Order requires that:

> For Consent Order Accounts that are located in the territorial jurisdiction of the United States of America, the Foreign Representatives shall not take any action that is inconsistent with the Kentucky Consent Orders in regard to such Consent Order Accounts, unless the Foreign Representatives have sought and received, after notice and hearing, either consent of this Court to take such action or an adjudication from this Court that the Foreign Representatives may take such action notwithstanding the existence of the Kentucky Consent Orders.

*Id*. at ¶ 17.A.

45.     Counsel to the Foreign Representatives first reached out to KeyBank on March 23, 2021, asserting rights to funds held in control of Goldenstar Holdings and the KeyBank Account ending in XXX1886.  *See* Motion to Compel at ¶ 7.  Upon information and belief, the KeyBank Account to which the Foreign Representatives seek control over is the same account that counsel to Goldenstar Holdings acknowledged would be preserved until the conclusion of the Kentucky Litigation to pay claims of the defrauded policyholders.  *See* Exhibits C and F. In seeking to gain control over the funds located in a Consent Order Account without first obtaining consent of this Court, the Foreign Representatives violated the procedures expressly set forth in the Recognition Order. *See* Recognition Order at ¶ 17.A.

46.     According to the Debtor, counsel for the Foreign Representatives contacted KeyBank on not less than three occasions following entry of the Recognition Order, for the sole purposes of gaining access to the funds in the KeyBank Account. *See* Motion to Compel at ¶¶ 6-11.  The Foreign Representatives also issued a subpoena to KeyBank compelling the production of documents for a number of segregated portfolio companies affiliated with the Debtor along with all monthly statements and any other statements held by Goldenstar from January 1, 2019 to present. *Id*. at 12. The Foreign Representatives' unilateral turnover efforts were unsuccessful, despite multiple attempts to gain access to the KeyBank Account.[6]

47.     On June 25, 2021, the Foreign Representatives filed the Motion to Compel seeking an order directing KeyBank to turnover funds. However, because each and every dollar held within the KeyBank Account was obtained by the Debtor through the fraudulent Gagliardi Insurance

---

[6] Based upon the facts laid out by Debtor in the Motion to Compel, Lexington may file a motion to hold Debtor in contempt of the Recognition Order, and all rights thereto are reserved.

Program, the funds are not the rightful property of the Debtor. Therefore, the Motion to Compel should be denied, and the KeyBank Account funds should be set aside for the sole benefit of defrauded policyholders, as set forth in the Consent Order.

## **DISCUSSION**

### I.    Fraudulently Obtained Goldenstar Account Funds Do Not Constitute Property Of The Estate

48.    Section 541(a)(1) broadly defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case" (11 U.S.C. § 541(a)(1)). However, it is settled as a general rule that property obtained by the fraudulent acts of a debtor does not properly become part of the assets of a debtor's estate. *Heyman v. Kemp (In re Teltronics, Ltd.)*, 649 F.2d 1236, 1239 (7th Cir. 1981) ("[I]t is settled that property obtained by fraud of the bankruptcy is not part of the bankrupt's estate."); *Bergquist v. Wiese & Cox, Ltd. (In re AEFS, Inc.)*, 51 B.R. 340, 344 (Bankr. D. Minn. 1985). It is also true that, as a general rule, in transactions between consumers and a debtor, consumers have been allowed to obtain the return of their property based on an argument that they were defrauded into delivering the property to the debtor and, therefore, the property never became property of the estate. *See Heyman*, 649 F.2d at 1241. A debtor's interest in property is to be determined by state law. *See Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1197 (11th Cir. 2001).

49.    The Trustee carries the burden of proof in a motion for turnover of estate property. *Maggio v. Zeitz*, 333 U.S. 56, 64, 68 S. Ct. 401, 92 L. Ed. 476 (1948). The Trustee must prove that the subject property constitutes property of the estate and that the defendant is in possession of that property. *Id*. While older case law suggests that the burden of proof is by clear and convincing evidence, the correct standard is by a preponderance of the evidence. *See e.g., In re Santaella*, 298 B.R. 793 (Bankr. S.D. Fla. 2002).

19

50.     While the Bankruptcy Code does not prohibit the court from authorizing the foreign representative to employ turnover powers available under §§ 542 and 543, access to turnover powers under § 1521(a)(7) is conditioned upon sufficient protections being provided to creditors and other interested parties under § 1522, which requires a balancing of the respective parties' interests. *See* 11 U.S.C. § 1522(a) ("The court may grant relief available under section [] 1521 . . . only if the interests of creditors and other entities, including the debtor, are sufficiently protected."); *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012); *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 556-58 (E.D. Va. 2010); *CT Investment Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012).

51.     The Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law, which Chapter 15 was designed to incorporate, contains several safeguards designed to ensure the protection of local interests before assets are turned over to the foreign representative. Those safeguards include the following: (i) the general statement of the principle of protection of local interests (Art. 22 ¶ 1); (ii) that the court should not authorize the turnover of assets until it is assured that the local creditors' interests are protected (Art. 21 ¶ 2); and (iii) the court may subject the relief that it grants to conditions it considers appropriate. (Art. 22 ¶ 2).

52.     To the extent the Foreign Representatives must rely on 11 U.S.C. § 541 for standing in the case or right to possession of the funds in the KeyBank Account, they will not be insulated from the wrongdoing of the debtor. *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir.1996). Section 541(a) does not expand the property interests of a debtor beyond those held at the moment a bankruptcy case is started.  *In re Thomas*, 883 F.2d 991, 995 (11th Cir. 1989).

a.    **Debtor Admitted Through the May Consent Order that the KeyBank Account Funds Belong to Policyholders and Other Creditors**

53.    When the parties to the Kentucky Litigation (including the Debtor) entered into the Consent Orders, the parties were acknowledging that notwithstanding the merits of the claims against the Debtor, the funds contained in the Consent Order Accounts, including the KeyBank Account, did not rightfully belong to Debtor. Rather, they represented premium dollars paid by defrauded policyholders who purchased counterfeit policies. To ensure that the defrauded policyholders would have access to funds to pay otherwise legitimate claims on the counterfeit AIG policies, the Consent Orders provide (in paragraph 5 of each order) that the Debtor "shall not transfer, diminish or dissipate" funds in the Consent Order Accounts "other than to adjust, pay or settle claims made by **policyholders** and certificate holders in the normal course." Consent Orders at ¶ 5 (emphasis added); *see also* Exhibit F ("The current balance in the Goldenstar Holdings Company is $2,488,176.23. It is Goldenstar Holdings Company's intention to maintain this balance until this matter can be resolved."). Once claims of policyholders were paid, and a reserve was established to pay future claims, any monies left over could be used to compensate AIG, which has substantial Lanham Act claims (among others) against all Defendants, including Performance.

54.    Put more simply, the Consent Orders were entered precisely to ensure that the policyholders would receive distributions on funds contained in the Consent Order Accounts (for otherwise legitimate claims) in an expedited manner. But now, the Foreign Representatives seek to cast the defrauded policyholders into the broad pool of the Debtor's general unsecured creditors. Indeed, the Motion to Compel would have this Court believe that the funds contained in the KeyBank Account rightfully belong to the Debtor. However, case law is clear that the funds held in the KeyBank Account must not be treated in the same manner as general unsecured claims or judgments against the Debtor. *See, e.g., Heyman*, 649 F.2d at 1241 (holding that consumers may

recoup fraudulently obtained funds held by a receiver, apart from participating as general creditors in the bankrupt's estate, where state statute provides a mechanism for recovery against a fund wholly made up of the fruits of the frauds perpetrated against a myriad of victims).  The Kentucky Consumer Protection Act and a myriad of other state statutes provide for identical protections with respect to the distribution of assets to consumer victims of unlawful practices, appointment of a receiver, and placing funds into escrow accounts. *See, e.g.,* KRS Ch. 367.210.

55.    Performance expressly agreed to the entry of the Consent Orders.  The Consent Orders were an admission that the funds do not belong to the Debtor and an acknowledgment that the defrauded policyholders must be protected.   Notwithstanding the Foreign Representatives attempt to reverse course, the Consent Order has been incorporated into the Recognition Order. *See* Recognition Order at ¶¶ P, 17.A.  Therefore, appropriate measures must be taken to protect the interests of the defrauded policyholders as *every dollar* in the KeyBank Account was stolen as a result of the sale of counterfeit policies—a fraud on both AIG and the policyholders. The Foreign Representatives have not met their burden to prove otherwise. Therefore, the Motion to Compel should be denied.

### b.    A Constructive Trust Should be Applied to the KeyBank Account

56.    If there is *any* question as to whether the KeyBank Account funds are property of the Debtor's estate (they are not), the Court should impose a constructive trust on the KeyBank Account to preserve it for the policyholders and AIG.  "A constructive trust generally arises to restore property to its rightful owner and to prevent unjust enrichment when it is against equity for a person to retain property obtained by fraud or other questionable means." *In re Woolum*, 279 B.R. 865, 869-870 (Bankr. M.D. Fla. 2002). The following must be shown by a claimant to establish that a constructive trust is warranted: "(1) a promise, express or implied, (2) transfer of

the property and reliance thereon, (3) a confidential relationship and (4) unjust enrichment." *In re Schneider*, 2006 Bankr. LEXIS 525, *6, 2006 WL 839260, Case No. 05-36703P3 (Bankr. M.D. Fla. February 6, 2006) citing *Provence v. Palm Beach Taverns, Inc.*, 676 So. 2d 1022, 1025 (Fla. 4th DCA 1996).

57.     Constructive trusts are enforced in bankruptcy, albeit with caution. *See e.g., Wisconsin v. Reese, (In re Kennedy & Cohen, Inc.)*, 612 F.2d 963 (5th Cir. 1980), cert. denied, 449 U.S. 833, 101 S. Ct. 103, 66 L. Ed. 38 (1980); *McAllester v. Aldridge, (In re Anderson)*, 30 B.R. 995 (M.D. Tenn. 1983); *In re American Intern. Airways*, 44 B.R. 143 (Bankr. E.D. Pa. 1984); *Kagan v. Martin, (In re Tufts Electronics, Inc.)*, 34 B.R. 455 (Bankr. D. Mass. 1983); *Travelers Insurance Co. v. Angus*, 9 B.R. 769 (Bankr. D. Or. 1981).

58.     Importantly, the imposition of a constructive trust means that the property is excluded from the bankruptcy estate. Under 11 U.S.C. § 541(d), such property becomes property of the estate only to the extent of the debtor's legal title and not to the extent of any equitable interest which the debtor does not hold. Thus, the imposition of a constructive trust limits the equitable interest in property that can be passed on to the trustee. *Lambert v. Flight Transportation Corp., (In re Flight Trans. Corp. Securities Litigation)*, 730 F.2d 1128, 1136-37 (8th Cir. 1984), cert. denied sub nom., *Reavis McGrath v. Antinore*, 469 U.S. 1207, 105 S. Ct. 1169, 84 L. Ed. 2d 320 (1985); *In re Kennedy & Cohen, Inc.*, 612 F.2d at 966, (Order of District Court, appended to opinion); *Cook v. United States Commodity Credit Corp., (In re Earl Roggenbuck Farms)*, 51 B.R. 913 (E.D. Mich. 1985).

59.     As noted above, a constructive trust arises at the time when the events that result in the constructive trust occur. *See In re General Coffee Corp.* 828 F.2d 699 (11th Cir. 1987) (A constructive trust arising from fraud was created at the time of the fraud, so that property subject

to a constructive trust did not become part of a bankruptcy estate.). Here, the constructive trust similarly arose years prior to the Chapter 15 Case when Ambassador and White induced the policyholders into believing that they were insured by Lexington by entering into counterfeit insurance contracts, when in fact they were not. The Debtor was unjustly enriched by inducing the policyholders to pay premiums for counterfeit policies. Indeed, the Debtor represented and warranted that more than $6 million in premiums were collected Goldenstar Holdings in connection with the Gagliardi Insurance Program and there is now at least $2.4 million remaining in the KeyBank Account that was held in escrow specifically to cover any potential claims made in connection with the Gagliardi Insurance Program. *See* May Consent Order at Pages 2-3; *see also* Exhibit F. These funds belong to the victims of the fraud schemes—the policyholders who paid premiums for the bogus policies and AIG whose mark was stolen to create the counterfeit policies in the first instance.

60. As a general rule, section 541(d) prevails over the trustee's strong-arm powers. Although those powers allow a trustee to assert rights that a debtor itself could not claim to property, Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own. *Vineyard v. McKenzie, (In the Matter of Quality Holstein Leasing)*, 752 F.2d 1009, 1013-1014 (5th Cir. 1985); *see also Flight Trans. Corp.* at 1136-37. Here, the Debtor did not own the premium dollars paid by defrauded policyholders to purchase counterfeit policies. That money, to the extent needed to pay otherwise legitimate claims, belongs to the policyholders (so they get the benefit of their bargain—insurance) and to AIG, whose mark was stolen to create the counterfeit policies in the first instance. By no means is the fruit of this criminal counterfeiting scheme the property of the Debtor.

24

61.    As the Debtor sought in filing the Chapter 15 Case to insulate the fraudulent funds in the KeyBank Account by taking advantage of the bankruptcy process, and ultimately to nullify the Consent Orders, the Debtor must not be rewarded by allowing the KeyBank Account to be used for the benefit of its estate.

## CONCLUSION

62.    For all of these reasons, the Court should deny the relief requested in the Motion to Compel. The KeyBank Account should remain under KeyBank's control, and the funds in the account should continue to be preserved and not be handed over to the Foreign Representatives to the detriment of the defrauded policy holders and AIG.

63.    Lexington reserves its rights, to the extent necessary, to assert additional or alternative bases for objection. Furthermore, Lexington asserts all of its defenses and objections herein as affirmative defenses, as necessary, and reserves all of its defenses and objections to entry of an Order compelling turnover of documents.

WHEREFORE, Lexington respectfully requests that this Court (i) deny the Motion; (ii) sustain the Objection; and (iii) grant such other relief as may be just and proper.

Dated: July 12, 2021                                    Respectfully submitted,
Miami, Florida

                                    By:    */s/ John T. Rogerson, III*
                                           John T. Rogerson III
                                           Florida Bar No. 832839
                                           ADAMS AND REESE LLP
                                           john.rogerson@arlaw.com
                                           dana.tompkins@arlaw.com
                                           501 Riverside Avenue, Suite 601
                                           Jacksonville, FL 32202
                                           Main Telephone: (904) 355-1700
                                           Direct Dial Telephone: (904) 493-3303

                                           -and-

Leib M. Lerner (*pro hac vice*)
ALSTON & BIRD LLP
CA State Bar No. 227323
333 S. Hope Street, 16th Fl.
Los Angeles, CA 90071
T: (213) 576-1000

*Counsel for Lexington Insurance Company*