# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

LEXINGTON INSURANCE COMPANY,

        Plaintiff,

        v.

THE AMBASSADOR GROUP, LLC d/b/a
AMBASSADOR CAPTIVE SOLUTIONS;
GAGLIARDI INSURANCE SERVICES, INC.;
GOLDENSTAR SPECIALTY INSURANCE,
LLC; PERFORMANCE INSURANCE
COMPANY SPC on behalf of GOLDENSTAR
HOLDINGS COMPANY SP and on behalf of
SMART INSURE SP; and BRANDON WHITE,

        Defendants.

Case No. ___3:20-cv-330-JRW___

**DECLARATION OF JOSEPH DAVINA**
**IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

I, Joseph Davina, declare as follows:

1.      I am currently the Vice President of AIG Captive Solutions, a division of American

International Group, Inc. ("AIG"), a publicly traded insurance holding company. AIG directly or

indirectly owns a number of insurance companies, including Lexington Insurance Company

("Lexington"). I have been employed by AIG subsidiary companies since 2006. Since 2018, I

have had managerial oversight of certain of AIG's group captive reinsurance programs. I submit

this declaration, of my own personal knowledge and based upon AIG's books and records, in

support of Lexington's motion for a temporary restraining order and preliminary injunction.

2.      As set forth below, AIG and Lexington are the victims of an ongoing scheme involving (a) the sale of numerous counterfeit insurance policies to unsuspecting consumers who have been defrauded, (b) the forgery of my signature on a facultative reinsurance agreement, and (c) the infringement of Lexington's registered trademark for an unlawful and fraudulent purpose. Lexington seeks injunctive relief enjoining the parties responsible for this unlawful conduct from continuing their scheme and further harming Lexington and the public.

A.       **"Captive Reinsurance"**

3.      The Defendants' fraud scheme involves an area of insurance known as "captive reinsurance." Captive reinsurance arrangements are complex, requiring specialized expertise and significant underwriting capacity.

4.      In the type of captive reinsurance program at issue in this lawsuit, an insurance broker or other company (the "Broker/Owner") forms and owns a captive reinsurance company (the "Captive"). The Captive is ultimately responsible to pay some or all of the losses on policies sold by the Broker/Owner.

5.      Because Captives are not licensed direct insurers, the Broker/Owner seeks to engage a commercial insurer (such as Lexington, AIG's subsidiary surplus lines insurer) (the "Issuing Carrier") to issue the insurance policies to be sold and then reinsure such policies to the Captive.

6.      The apportionment of risk between the Issuing Carrier and the Captive is typically documented in a reinsurance agreement through which the Captive (as the reinsurer) agrees to reimburse the Issuing Carrier for some or all of the losses incurred under the policies.

7.      Typically, the Captive pays the Issuing Carrier a "fee" or "commission payment" for acting as the Issuing Carrier. In addition, the Captive provides collateral to the Issuing Carrier

to secure, among other things, the Captive's obligation to reimburse the Issuing Carrier for any reinsured losses that the Issuing Carrier incurs.

8.      These multi-party transactions are often facilitated by a "captive intermediary" – an entity that assists a Broker/Owner in developing an actuarial model and business plan, forming the Captive, and—most importantly—identifying and engaging an Issuing Carrier to issue the policies to be sold by the Broker/Owner and reinsured to the Captive.

9.      AIG is often approached by captive intermediaries soliciting an AIG-affiliated insurer to act as an Issuing Carrier on captive reinsurance deals.  Through my role at AIG, I routinely interact with captive intermediaries, who seek to develop business relationships with AIG.

**B.      Brandon White, Ambassador, and the Gagliardi Insurance Program**

10.     I first became acquainted with Brandon White, the founder and a principal of a captive intermediary, The Ambassador Group, LLC ("Ambassador") in early 2018.

11.     Mr. White initially reached out to my supervisor, Mark Benz, to solicit AIG's involvement in a number of captive reinsurance deals.  Mr. Benz instructed me to address Ambassador's proposals.  I then had several telephone conversations with Mr. White in early 2018 about potential captive arrangements in Ambassador's portfolio for which an AIG-affiliated insurer could act as the Issuing Carrier.

12.     During my calls with Mr. White, he explained that QBE Insurance Group, Ltd. ("QBE") was the carrier for most captive arrangements in Ambassador's portfolio, but that Ambassador was looking for a change.  Mr. White told me that he was interested in moving Ambassador's entire captive portfolio to AIG.

13.     On June 18, 2018, Mr. Benz and I visited Mr. White and his Ambassador colleagues, Aaron Lubbers and Darin Smith, in Louisville, Kentucky, where Ambassador is based. During our visit, Ambassador made a presentation to me and Mr. Benz regarding Ambassador's business model and captive portfolio.

14.     Following our visit, we agreed to have an AIG-affiliated insurer (not Lexington) act as the Issuing Carrier for two different group captive programs in Ambassador's portfolio. Both programs successfully launched in 2018 and, from AIG's perspective, operated smoothly. Throughout 2018 and 2019, Mr. Benz and I regularly communicated with Mr. White and his Ambassador colleagues regarding these two group captive programs, including two additional in-person meetings with Mr. White.

15.     In August 2018, Mr. White solicited me to have an AIG-affiliated insurer act as the Issuing Carrier for a different captive program in Ambassador's portfolio—a captive reinsurance program involving policies that would be sold by a broker, Gagliardi Insurance Services, Inc. ("Gagliardi Insurance"), and reinsured to Goldenstar Holdings Company SP ("Goldenstar Holdings"), which is a segregated cell of Ambassador's Cayman Island captive reinsurer, Performance Insurance Company SPC ("Performance") (the "Gagliardi Insurance Program").

16.     Mr. White provided me with the submission documents for the proposed reinsurance program, including unaudited financial statements and an actuarial analysis.  In short, the program contemplated a captive reinsurance arrangement in which Gagliardi Insurance, as the Owner/Broker, would sell policies issued by an AIG insurer, which in turn would be reinsured by the segregated cell of Performance, Goldenstar Holdings, which is ultimately owned by Gagliardi Insurance.

17.     The Gagliardi Insurance Program that Mr. White and Ambassador pitched to AIG contemplated the execution of a Managing General Agent Agreement ("MGA Agreement") or Program Administration Agreement ("PA Agreement") under which Gagliardi Insurance would have the "power of the pen"—a term of art meaning that Gagliardi Insurance would have the ability to issue policies in the name of the AIG-affiliated insurance company serving as the Issuing Carrier.

18.     While the Issuing Carrier typically directly issues the policies, for some programs the Broker/Owner has the authority pursuant to an MGA or PA Agreement to issue policies in the name of the Issuing Carrier, subject to specific guidelines set forth in the MGA or PA Agreement.

19.     Mr. White explained to me that the Gagliardi Insurance Program would provide accident and health ("A&H") coverage for various youth and professional sports teams and leagues.  Mr. White explained to me that the Gagliardi Insurance Program had launched in March 2018 with QBE as the Issuing Carrier but that Gagliardi quickly became unhappy with QBE and wanted a new Issuing Carrier.

20.     Mr. White also informed me that the designated third-party administrator ("TPA") for the Gagliardi Insurance Program was Health Special Risk, Inc. ("HSR").  A TPA adjusts and administers insurance claims on behalf of a carrier.  AIG maintains a list of approved TPAs and has a business division that vets, approves, and monitors TPAs.

21.     Because HSR was not on AIG's list of approved TPAs, I informed Mr. White at the outset that, if AIG agreed to participate in the Gagliardi Insurance Program, HSR would need to undergo AIG's rigorous approval and onboarding process, which could take months.

22.     Because this type of transaction is not the type typically written by my business unit, the submission documents were forwarded to others at AIG who would be responsible for

approving or declining AIG's participation in the Gagliardi Insurance Program. Among others, the A&H underwriting team received the submission documents for review because the Gagliardi Insurance Program was an A&H program.

**C.      AIG's Declination of the Gagliardi Insurance Program**

23.      After reviewing the submission materials, the A&H underwriting team quickly reported that it was not interested in the program.

24.      Accordingly, in or around October 2018, I informed Mr. White that AIG's affiliated companies were not interested in the Gagliardi Insurance Program. After I communicated AIG's affiliated companies' declination to Mr. White, Mr. White asked me on several more occasions over the following months to revisit the opportunity. Each time, I told Mr. White that AIG was not interested in having any of its affiliates participate as the Issuing Carrier.

25.      I never signed any agreement in connection with the Gagliardi Insurance Program. I never authorized anyone to sign an agreement on my behalf in connection with the Gagliardi Insurance Program. As set forth above, AIG's affiliated companies declined the opportunity to act as the Issuing Carrier for this program.

**D.      HSR Contacts Me as if AIG Was the Issuing Carrier, and Mr. White Tells Me That It Was a Simple Mistake**

26.      In December 2018, I received an email from Tom Lenihan at HSR requesting to move forward with the TPA agreement for the Gagliardi Insurance Program, stating that the deal went into effect with Lexington on July 1, 2018.

27.      I immediately questioned Mr. White (by email) about Mr. Lenihan's email because neither Lexington nor AIG had agreed to act as the program's Issuing Carrier, so Mr. Lenihan's email to me made no sense.

28.     Mr. White responded by asking me not to contact HSR and explaining that it was just a miscommunication "on the client side."  That is, Mr. White was telling me that HSR simply made a mistake and contacted the wrong Issuing Carrier.  A copy of this email chain is attached hereto as Exhibit 1.

### E.     HSR Sends Me an Email That I Purportedly Sent but Did Not Send

29.     A week later, I received another email from Mr. Lenihan, forwarding to me an email that he received from Mr. White.  Mr. White's email to Mr. Lenihan, in turn, forwarded an email that appeared to be from my AIG email account to Mr. White and Mr. Smith (one of Mr. White's colleagues at Ambassador).  But I did not write or send that email.

30.     The fabricated email purportedly coming from my email account ostensibly granted HSR "conditional approval" to manage claims until AIG formally approved HSR.  Mr. White forwarded the fabricated email to HSR, which then forwarded it to me.

31.     Again, I immediately questioned Ambassador, and emailed Mr. White and Mr. Smith.  Mr. Smith denied that he or Mr. White had any knowledge of the fabrication and vowed to get to the bottom of it.  A true and accurate copy of this email chain is attached as Exhibit 2.

32.     Shortly thereafter, in January 2019, I had a meeting with Mr. White at AIG's office in New York to discuss, among other things, the two group captive arrangements for which another AIG company (not Lexington) was acting as the Issuing Carrier.  During that meeting, I again inquired about the fabricated email purportedly sent from my email account.  Mr. White assured me that no one from Ambassador was involved in the fabrication and that Ambassador would never engage in such conduct.

F.     **Atlas Seeks Information from Me Concerning Collateral for the Gagliardi Insurance Program**

33.     In February 2019, Beth Biega from Atlas Insurance Management ("Atlas"), the captive manager for Goldenstar Holdings, emailed me seeking language for a letter of credit, which ostensibly was to serve as Lexington's collateral from Goldenstar Holdings for the Gagliardi Insurance Program.

34.     I sent Atlas' email to Mr. White, asking him why I was continuing to receive correspondence about a program AIG's affiliated companies had declined.   Mr. White apologized that AIG kept "getting tagged" and passed it off as a "miscommunication on the clients [sic] part and messaging from the captive manager."  A true and accurate copy of this email chain is attached as Exhibit 3.

G.     **The Unsigned Reinsurance Agreement**

35.     Also in February 2019, Adrian Marshall from Helmsman Management Services ("Helmsman") emailed me introducing Helmsman as the new TPA for the Gagliardi Insurance Program.

36.     When I replied to Mr. Marshall that no AIG-affiliated insurance carrier was the Issuing Carrier for the Gagliardi Insurance Program, he provided me with an unsigned draft of a facultative reinsurance agreement between Goldenstar Holdings and Lexington.

37.     I forwarded the draft agreement to Mr. White to find out what was going on.  Mr. White responded that it was a draft based on a template that had been prepared earlier in the year when Mr. White asked AIG to participate in the Gagliardi Insurance Program, but that it was "not in effect, obviously."  A true and accurate copy of this email chain is attached as Exhibit 4.

### H.     The Forged Reinsurance Agreement

38.     On November 19, 2019, Ms. Biega from Atlas emailed me (copying Mr. White) a "fully executed Facultative Reinsurance Agreement" with a signature purporting to be mine on Lexington's behalf dated August 17, 2018 (the "Forged Reinsurance Agreement").  A true and accurate copy of the Forged Reinsurance Agreement that Ms. Biega emailed to me is attached as Exhibit 5.

39.     The signature on the Forged Reinsurance Agreement is not mine.  I never signed any agreement with Goldenstar Holdings and never authorized anyone to do so on my behalf. Someone forged my signature on that document.

40.     In the body of her email to me, Ms. Biega requested wiring instructions for Lexington's "commission payment."  In other words, Ms. Biega sought details on how to send Lexington its commission payment for acting as the Issuing Carrier for the Gagliardi Insurance Program.

41.     I responded by telling Ms. Biega that the reinsurance agreement was forged and demanded that Mr. White explain the forgery.

### I.     Mr. White Admits That the Agreement Was Forged

42.     Mr. White responded by apologizing for the "misrepresentation" and advising that Ambassador was "working to track down the genesis of this document."  Mr. White further assured me that the forged contract "did not come from Ambassador in any way."  He promised to "get to the bottom" of the forgery.  A true and accurate copy of this email chain is attached as Exhibit 6.

### J.     The Counterfeit Insurance Policies

43.     Subsequently, on March 3, 2020, AIG's outside counsel, Adam Kaiser, provided me with eleven insurance policies (which I understood were given to him by Ambassador's

counsel) issued in connection with the Gagliardi Insurance Program.  These are attached to the Complaint as Exhibits I-S (the "Counterfeit Insurance Policies").  Each of these policies was issued in the name of Lexington.

44.     Lexington did not authorize Gagliardi Insurance or anyone else to issue these policies in Lexington's name.  What's more, Lexington was not aware of the existence of the Counterfeit Insurance Policies until March 3, 2020.

45.     To be clear,  no AIG-affiliated insurance company ever agreed to act as the Issuing Carrier for the Gagliardi Insurance Program; Lexington never received any commission payment or premiums in connection with the Counterfeit Insurance Policies; it never received any collateral in connection with the Forged Reinsurance Agreement; it never authorized any TPA to administer claims on the Counterfeit Insurance Policies; and it was never even aware of the Counterfeit Insurance Policies until March 2020, when it was investigating Ambassador's fraud in connection with the Forged Reinsurance Agreement.

46.     Significantly, captive reinsurance programs are complex, multi-party arrangements that take months to analyze and document. These are not "off-the-shelf" products.  Before one of AIG's affiliated insurers would agree to act as the Issuing Carrier for a program such as the Gagliardi Insurance Program, it would conduct robust diligence involving multiple business units. Among other things,  it would conduct detailed actuarial, financial and credit analyses; it would calculate the required collateral; it would enlist counsel to assist in drafting documents; and it would  generate and provide the captive intermediary with a quote, and, if the quote is accepted, develop and provide a detailed binder setting forth the terms of the AIG affiliate's engagement. This process is multi-step, intensive, and typically takes many months to complete.

47.     No part of that detailed process occurred with respect to the Gagliardi Insurance Program, because, as stated above, AIG's affiliated companies rejected the opportunity following the A&H team's review of the submission documents.  AIG never conducted any actuarial, financial or credit analysis of this program, never issued a quote or binder, and never agreed to act as the Issuing Carrier on this program.

48.     Furthermore, I did not have power of attorney to execute a reinsurance agreement for the type of agreement reflected by the Forged Reinsurance Agreement.  What's more, Lexington would not have been the AIG-affiliated insurance company that would have executed the reinsurance agreement had AIG decided to act as the Issuing Carrier for the Gagliardi Insurance Program.  Rather, the reinsurance agreement for A&H policies would have been issued by an admitted carrier (not a surplus lines carrier like Lexington).

49.     Hence, not only was my signature on the reinsurance agreement forged, but the forgers forged the signature of the wrong AIG executive on behalf of the wrong AIG-affiliated insurance company.

**K.     Lexington Discovers the Madera Residential Fraud**

50.     While investigating the Gagliardi Insurance Program fraud, AIG discovered an entirely separate captive reinsurance program through which it appears that Mr. White and Ambassador have caused even more counterfeit Lexington policies to be fraudulently issued.

51.     In April 2019, Mr. White pitched a different captive reinsurance program to me involving property and personal liability insurance coverage to be issued to residents of properties operated by Madera Residential, Ltd. ("Madera Residential") with Smart Insure SP ("Smart Insure") as the captive reinsurance company (the "Madera Residential Insurance Program").  Smart Insure is another segregated cell of Performance, Ambassador's Cayman captive reinsurer.

52.     I referred Mr. White to my colleague, Vince Perrotta, to discuss the Madera Residential Insurance Program.  As with the Gagliardi Insurance Program, AIG declined to provide an AIG-affiliated insurer to act as the Issuing Carrier for the Madera Residential Insurance Program.

53.     Not only did AIG (or its affiliates) never sign any agreements in connection with the Madera Residential Insurance Program but, as with the Gagliardi Insurance Program, AIG never even conducted an actuarial or credit analysis on the program and never provided Ambassador with a quote.

54.     Nevertheless, Broadspire Services, Inc. ("Broadspire"), a TPA, contacted AIG periodically regarding the Madera Residential Insurance Program, even though AIG was not the Issuing Carrier for that program.

55.     Ultimately, I was provided with an Evidence of Property Insurance (a certificate of insurance) that appears to have been issued in connection with the Madera Residential Insurance Program.  A true and accurate copy of the Evidence of Property Insurance that I was provided is attached as Exhibit T to the Complaint.

56.     The Evidence of Property Insurance purports to reflect an insurance policy with Lexington as the insurer.

57.     Lexington did not issue any policies in connection with the Madera Residential Insurance Program and has not authorized anyone to issue any policies in Lexington's name in connection with the Madera Residential Insurance Program.  AIG declined Ambassador and Mr. White's request to have an AIG-affiliated insurer act as the Issuing Carrier for this program.

58.     The address for Lexington on the Evidence of Property Insurance—3 Beaver Valley Road, Wilmington, Delaware—is not an address that Lexington has ever used for insurance

certificates or policies.  Neither Lexington nor any AIG-affiliated insurance company currently has any office at that location.

59.     Lexington will suffer irreparable harm of the Defendants are not enjoined from engaging in the fraudulent conduct described above.  Lexington will lose control of the Lexington Mark, a trademark it has used and invested time and resources in for over 50 years, and the good will and excellent reputation currently associated with the Lexington Mark and Lexington name in the insurance industry.  Lexington's reputation will be damaged when  individuals holding the Counterfeit Insurance Policies and counterfeit insurance certificates seek coverage from Lexington, which Lexington will have to deny.

60.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 8th day of May, 2020.

JOSEPH DAVINA

# Exhibit 1

**From:** Brandon White [mailto:brandon.white@ambassadorcaptive.com]
**Sent:** Monday, December 03, 2018 11:04 AM
**To:** Davina, Joseph
**Cc:** Darin Smith
**Subject:** Re: HSR - Gagliardi Captive

Joe,

This is the guy I left you a voicemail about on Friday evening. I would prefer you don't call him back until we have clarity on what your team can do on the program. There is miscommunication here but it is on the client side. I can work through it but need your internal dialogue with Chris first so we know where to go from here.

Thanks Joe!

Sincerely,

Brandon M. White, CIC, CRM, CWCA
Founder/President
Ambassador Captive Solutions
9700 Park Plaza Avenue, Suite 201
Louisville, KY 40241
502.439.1555
www.ambassadorcaptive.com

"Everything should be made as simple as possible, but not simpler." - Roger Sessions, Composer

Sent from my iPhone

On Dec 3, 2018, at 10:42 AM, Davina, Joseph <Joseph.Davina@AIG.com> wrote:

FYI, this isn't in effect with us. Is there a miscommunication prior to me calling him?

**Joseph Davina, Vice President**
**AIG Risk Management | Group Captives**
175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345 | Mobile: (917) 224-3451
Joseph.Davina@aig.com | www.aig.com

**From:** Tom Lenihan [mailto:tomlenihan@hsri.com]
**Sent:** Monday, December 03, 2018 10:39 AM
**To:** Davina, Joseph

**Cc:** Marco Gagliardi
**Subject:** HSR - Gagliardi Captive

Mr. Davina:

Good morning. I left you a voice message this morning introducing myself. I am the President of Health Special Risk, Inc. (HSR) the TPA for the Gagliardi Participant Accident Captive program.

My contact information is below and I'd appreciate it greatly if we could talk today if at all possible. Best is via my cell – **(972) 741-6507**.

As you know this program went into effective on 7/1/18 with y'all and we need to move forward on getting HSR's TPA Agreement reactivated with AIG so that we can process and adjust claims that occurred since the move from QBE to AIG on July 1.

I look forward to speak with you at your earliest convenience.

Best regards,

Tom Lenihan


*Tom Lenihan*
*President*


*Health Special Risk, Inc.*
*HSR Plaza II*
4100 Medical Parkway, Suite 200
Carrollton, Texas 75007
**Direct: (972) 512-5700**
**Cell: (972) 741-6507**
**TomLenihan@hsri.com**

(972) 512-5701 Direct Fax
(972) 512-5600 Main
(972) 512-5820 Main Fax
**www.HealthSpecialRisk.com**

*This message and any attachments are sent for HSR business purposes and may contain confidential information intended only for the individual(s) named herein. If you are not the named addressee, please do not disseminate, distribute, alter or copy this e-mail. Please notify me immediately if you have received this e-mail in error. HSR makes every effort to secure any confidential information but e-mail transmissions cannot be guaranteed to be secure or error-free, as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, neither HSR nor I accept liability for any errors or omissions in the contents of this message which may arise during or as a result of e-mail transmission. Thank you & have a nice day.*


IMPORTANT: Please note that coverage cannot be bound, altered, or cancelled via email without confirmation from an authorized representative of Health Special Risk, Inc. CONFIDENTIALITY NOTICE: The information contained in this communication, including attachments, is privileged and confidential. It is intended only for the exclusive use of the addressee. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly

prohibited. If you have received this communication in error, please notify us by telephone immediately at 972-512-5600 or Toll-free at 800-328-1114 or by e-mail at CustomerService@HSRI.com. NOTE: Although we have taken steps to ensure that this e-mail and its attachments (if any) are free from any virus, the recipient should, in keeping with good computing practice, also check this e-mail and any attachments for the presence of viruses.

# Exhibit 2

**From:** Darin Smith [mailto:darin.smith@ambassadorcaptive.com]
**Sent:** Thursday, December 20, 2018 11:03 AM
**To:** Davina, Joseph
**Cc:** Brandon White
**Subject:** Re: Gagliardi Captive

Joe,

Good morning and thanks for passing that along. I can assure you this is the first we have seen of this and would never act in this capacity. I believe Brandon left you a voicemail already and I am on the road to meet a client for lunch. Call me if you get this email soon or let's aim for this afternoon to talk.

We're also at a loss of words and trying to figure out exactly how this occurred and who is responsible.

Thanks again,

Darin E. Smith
Ambassador Captive Solutions
9700 Park Plaza Avenue, Suite 201
Louisville, KY 40241
502.741.1883
www.ambassadorcaptive.com
darin.smith@ambassadorcaptive.com


Sent from my iPhone. This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited by law. If you have received this e-mail in error, please notify the sender by replying to this message and shred and/or delete this information immediately.

On Dec 20, 2018, at 10:43 AM, Davina, Joseph <Joseph.Davina@aig.com> wrote:

Guys,

This was sent to me. There is an email below from me to Brandon that I never sent. This is a bit disturbing to say the least. We need to discuss this as misrepresenting forged emails from me will not be tolerated. This is a serious violation and could result in a lot of trouble since I do not have any authority to grant this type of approval for A&H, approving TPA's, fronted deals and backdating.

Can someone explain this to me please because I am at a loss of words on how this is ethical.

Thanks,

**Joseph Davina, Vice President**
**AIG Risk Management | Group Captives**

175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345 | Mobile: (917) 224-3451
Joseph.Davina@aig.com | www.aig.com

**From:** Tom Lenihan [mailto:tomlenihan@hsri.com]
**Sent:** Tuesday, December 18, 2018 4:28 PM
**To:** Davina, Joseph
**Cc:** Marco Gagliardi
**Subject:** Gagliardi Captive

Mr. Davina:
I received a copy of your 12/10/18 email below to Darin Smith at Ambassador Captive giving HSR "**conditional approval to manage the claims for Goldenstar going back to 7/1/18".**
We would like to get the TPA Agreement process moving as fast as possible. Can you put me in direct touch with the appropriate person(s) at AIG that can make this happen?
I would greatly appreciate your response as soon as possible.
Thank you for your assistance.
Regards,

*Tom*
Tom Lenihan
*President*

***Health Special Risk, Inc.***
Direct: (972) 512-5700
Cell: (972) 741-6507

Fax: (972) 512-5701

*This message and any attachments are sent for HSR business purposes and may contain confidential information intended only for the individual(s) named herein. If you are not the named addressee, please do not disseminate, distribute, alter or copy this e-mail. Please notify me immediately if you have received this e-mail in error. HSR makes every effort to secure any confidential information but e-mail transmissions cannot be guaranteed to be secure or error-free, as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, neither HSR nor I accept liability for any errors or omissions in the contents of this message which may arise during or as a result of e-mail transmission. Thank you & have a nice day.*
**From:** brandon.white@ambassadorcaptive.com <brandon.white@ambassadorcaptive.com>
**Sent:** Monday, December 17, 2018 8:55 AM
**To:** Tom Lenihan <tomlenihan@hsri.com>
**Cc:** mgagliardi@gsportsinsurance.com
**Subject:** FWD: RE: Gagliardi Captive

Tom,

Per my discussion with Marco, please see the email below that is gives HSRI permission to manage the claims until we get the formal agreement in place. I hope this, accompanied by the agreement will allow us to move forward on reimbursing claims to QBE. More to come as I am pushing them daily for action on the formal agreement. I was waiting to send this in the hopes that they would have sent you an email directly and am pushing for this as well.

Sincerely,

2

Brandon M. White, CIC, CRM, CWCA
President/Founding Partner
Ambassador Captive Solutions
9700 Park Plaza Avenue, Suite 201
Louisville, KY 40241
502.439.1555
www.ambassadorcaptive.com
"Everything should be made as simple as possible, but not simpler." -Roger Sessions, Composer

--------- Original Message ---------

Subject: RE: Gagliardi Captive
From: "Davina, Joseph" <Joseph.Davina@AIG.com>
Date: 12/10/18 12:03 pm
To: "Darin Smith" <darin.smith@ambassadorcaptive.com>
Cc: "Brandon White" <brandon.white@ambassadorcaptive.com>

Hi Darin,

I will be communicating with HSRI this week that they have our conditional approval to manage the claims for Goldenstar going back to 7/1/18 until we get them formally back on our list of approved TPAs. We are working to get this done through all of the internal transition items and we have been delayed but our agreement is in force.

We are waiting to meet with Chris as we speak. We will circle back shortly.

Thanks,

Joseph Davina, Vice President
AIG Risk Management | Group Captives
175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345
Joseph.Davina@aig.com | www.aig.com

IMPORTANT: Please note that coverage cannot be bound, altered, or cancelled via email without confirmation from an authorized representative of Health Special Risk, Inc. CONFIDENTIALITY NOTICE: The information contained in this communication, including attachments, is privileged and confidential. It is intended only for the exclusive use of the addressee. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone immediately at 972-512-5600 or Toll-free at 800-328-1114 or by e-mail at CustomerService@HSRI.com. NOTE: Although we have taken steps to ensure that this e-mail and its attachments (if any) are free from any virus, the recipient should, in keeping with good computing practice, also check this e-mail and any attachments for the presence of viruses.

Exhibit 3

**From:** Brandon White [mailto:brandon.white@ambassadorcaptive.com]
**Sent:** Friday, February 08, 2019 11:53 AM
**To:** Davina, Joseph  darin.smith@ambassadorcaptive.com
**Subject:** Re: Goldenstar Insurance SP

I am on this, Joe   sorry you keep getting tagged. It is a mix of miscommunication on the clients part and messaging from the captive manager. I am here in Cayman this week getting it straightened out on this side.

Sincerely,

Brandon M. White, CIC, CRM
Founder/President
Ambassador Captive Solutions
9700 Park Plaza Avenue, Suite 201
Louisville, KY 40241
502.439.1555
www.ambassadorcaptive.com

"Simplicity is the ultimate sophistication.      da   inci (or) Clare Boothe Luce

**From:** "Davina, Joseph"
**Date:** Friday, February 8, 2019 at 11:29 AM
**To:** Brandon White , "darin.smith@ambassadorcaptive.com"
**Subject:** Fwd: Goldenstar Insurance SP

Hey Guys,

Hope all is well. Can we figure this out? Does AIG write Goldenstar that I'm not aware of? This is Gagliardi which we do not write. We need to figure out why we keep getting asked about this.

Thanks,

**Joseph Davina, Vice President**
**AIG Risk Management | Group Captives**
175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345 | Mobile: (917) 224-3451
Joseph.Davina@aig.com | www.aig.com

Begin forwarded message:

**From:** Beth Biega <BBiega@atlascaptives.com>
**Date:** February 8, 2019 at 1:27:04 PM GMT-3
**To:** "Davina, Joseph" <Joseph.Davina@AIG.com>
**Cc:** "Rogers, Brian" <brian.rogers@aig.com>, Brenda Munnelly <bmunnelly@atlascaptives.com>
**Subject: R  : Goldenstar Insurance SP**

Hi,

Yes, it is Ambassador. Thank you for getting back so  uickly.

Kind regards,
Beth


Beth Biega
*Vice President*
Tel:  1 345-945-5556

   

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender immediately and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**From:** Davina, Joseph <Joseph.Davina@AIG.com>
**Sent:** Friday, February 08, 2019 11:18 AM
**To:** Beth Biega <BBiega@atlascaptives.com>
**Cc:** Rogers, Brian <brian.rogers@aig.com>  Brenda Munnelly <bmunnelly@atlascaptives.com>
**Subject:** Re: Goldenstar Insurance SP

Hi Beth,

Can you advise who the captive intermediary is on this? Is it Ambassador?

Thanks,

**Joseph Davina, Vice President**
**AIG Risk Management | Group Captives**
175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345 | Mobile: (917) 224-3451
Joseph.Davina@aig.com | www.aig.com

On Feb 8, 2019, at 1:13 PM, Beth Biega <BBiega@atlascaptives.com> wrote:

Good morning Brian & Joe,
I'm trying to obtain the LOC wording for Goldenstar's LOC to Lexington, can you please provide the
re uired wording from Lexington? If you are not the correct contact for the above Captive please let me
know who I should be speaking with.

Kind regards,

2

Beth


Beth Biega
*Vice President*

Whitehall House, 3rd Floor, 238 North Church Street

PO Box 699, Grand Cayman, KY1-1107, Cayman Islands

Tel:   1 345-945-5556

Fax:   1 345-945-5557

Skype: bethbiega


www.atlascaptives.com                    bbiega@atlascaptives.com

Anguilla | Bahamas | Cayman Islands | Nevis | D.C. | Delaware | Georgia | Montana | North Carolina | Oklahoma | South Carolina | Tennessee | Texas |    tah

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender immediately and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

Exhibit 4

**From:** Brandon White [mailto:brandon.white@ambassadorcaptive.com]
**Sent:** Thursday, February 14, 2019 5:28 PM
**To:** Davina, Joseph
**Cc:** Darin Smith
**Subject:** Re: Goldenstar Insurance Holdings

Joe,

This is not an agreement within Lexington. This is the draft document built from the framework that David Branca sent me back in late-August/early-September when you mentioned that AIG could execute on Gagliardi as long as Performance 1 went also. We put drafts together to prep business plan changes and to confirm language with legal to determine if changes will need to be re  uested once a change is made. We do this pro-actively to get ahead of challenges. This is not in effect, obviously. Nor should a draft be in anyone's hands. Not sure how this is out there. I have called Adrian to get clarity immediately. You won't hear from him again.

Helmsman is working on the GL side of things which we are placing through a broker...the captive manager must have sent this by mistake. It did not come from us. Sorry for the noise, Joe.

Sincerely,

Brandon M. White, CIC, CRM, CWCA
Founder/President
Ambassador Captive Solutions
9700 Park Plaza Avenue, Suite 201
Louisville, KY 40241
502.439.1555
www.ambassadorcaptive.com

"Everything should be made as simple as possible, but not simpler." -Roger Sessions, Composer

On Feb 14, 2019, at 4:41 PM, Davina, Joseph <Joseph.Davina@aig.com> wrote:

Hey Guys,

Which unit within Lexington does this reinsurance agreement go with? Just not sure who wrote Goldenstar within Lexington.

Thanks,

Joe

**Joseph Davina, Vice President**
**AIG Risk Management | Group Captives**
175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345 | Mobile: (917) 224-3451
Joseph.Davina@aig.com | www.aig.com

**From:** Marshall, Adrian [mailto:Adrian.Marshall@helmsmantpa.com]
**Sent:** Thursday, February 14, 2019 4:29 PM
**To:** Davina, Joseph
**Subject:** RE: Goldenstar Insurance Holdings

Thanks Joe.

I dug up the attached, any chance you can point me in the right direction?

Regards, Adrian

**From:** Davina, Joseph [mailto:Joseph.Davina@AIG.com]
**Sent:** Thursday, February 14, 2019 4:00 PM
**To:** Marshall, Adrian <Adrian.Marshall@helmsmantpa.com>
**Subject:** E TERNAL RE: Goldenstar Insurance Holdings

Hi Adrian,

Is this in regards to Gagliardi? If so we are not the carrier on this fronted program. I'm not sure why this is coming up as AIG but we never  uoted the Goldenstar opportunity. I have brought this up to Ambassador multiple times so not sure where the disconnect is.

Thanks

Joe

**Joseph Davina, Vice President**
**AIG Risk Management | Group Captives**
175 Water Street, 26th Floor, New York, NY 10038
Direct: (646) 857-1345 | Mobile: (917) 224-3451
Joseph.Davina@aig.com | www.aig.com

**From:** Marshall, Adrian [mailto:Adrian.Marshall@helmsmantpa.com]
**Sent:** Thursday, February 14, 2019 3:51 PM
**To:** Davina, Joseph
**Subject:** RE: Goldenstar Insurance Holdings

Joseph, please get back to me at your earliest convenience. We have a contract in place effective **1//1/  1**  and need to connect with you re the loss billing and reporting issues.

Thanks, Adrian

Adrian Marshall
Senior Account Executive
HMS distribution & Service    East
2530 Sever Rd, suite 200
Lawrenceville, GA 30093
Direct    470-539-5895

Mobile   678-644-7264
Adrian.marshall@helmsmantpa.com

**From:** Marshall, Adrian
**Sent:** Tuesday, February 05, 2019 3:49 PM
**To:** Joseph.davina@aig.com <Joseph.davina@aig.com>
**Subject:** Goldenstar Insurance Holdings

Good afternoon Joseph.

We are the new TPA for the above client of your group. I was hoping you could put me in touch with the underwriter to go over the contractual re  uirements such as billing etc

Regards, Adrian

Adrian Marshall
Senior Account Executive
HMS distribution & Service    East
2530 Sever Rd, suite 200
Lawrenceville, GA 30093
Direct    470-539-5895
Mobile   678-644-7264
Adrian.marshall@helmsmantpa.com

3

# Exhibit 5

# FACULTATIVE REINSURANCE AGREEMENT

Goldenstar ~~Insurance~~ Holdings AB Company SP of Performance Insurance Company SPC

Effective July 1st, 2018 – July 1st, 2019

(this "Agreement")

Between **LEXINGTON INSURANCE COMPANY** and certain subsidiary and Affiliated companies of American International Group, Inc. and their respective successors and assigns (collectively, the "**Company**"), and Goldenstar ~~Insurance~~ Company SP of Performance Insurance Company SPC (the "**Reinsurer**"). Holdings AB

**WHEREAS**, the Company is willing to cede to the Reinsurer certain insurance written by the Company under the terms and conditions hereinafter set forth, and the Reinsurer is willing to reinsure such business on said terms and conditions:

**NOW, THEREFORE**, in consideration of their mutual obligations in relation to this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Company and the Reinsurer do hereby mutually agree upon the following:

## ARTICLE I – DEFINITIONS

1.1     As used in this Agreement the following words shall have the following meaning:

"Affiliate" shall mean in relation to any Party, any direct or indirect subsidiary or parent company of that Party and any direct or indirect subsidiary of any such parent company.

"Allocated Loss Expenses" shall mean all expenses paid by the Company in the investigation, appraisal, adjustment, litigation and defense of claims, including court costs, lawyers' fees, fees paid to loss adjusters and any interest payable by the Company with respect to the foregoing, but excluding internal office expenses and salaries of the Company's employees.

"Certificate" means the Certificate of Reinsured Coverages, Certificate of Renewal of Reinsured Coverages, Binder of Reinsurance or Policy and Funding Schedule, which may be updated from time to time, as attached to and part of this Agreement.

"Claims Administrator" means the claims administrator named in the Claims Service Agreement.

"Claims Service Agreement" means the claims service agreement entered into pursuant to Article VI.

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013

"Declaratory Judgment Expense" means amounts paid by the Company in connection with the analysis, prosecution, defense, or resolution of an action or proceeding, whether for declaratory judgment or other action or proceeding, to determine the obligations as between the Company and the insured under the Policies. Declaratory Judgment Expense shall include legal fees and court costs but exclude internal office expenses and salaries of the Company's employees.

"Excess Limits Liability" means any amount for which the Company would have been contractually liable to pay had it not been for the relevant limits of liability of the Policy.

"Extra Contractual Obligation" means those liabilities not covered under any other provision of this Agreement, for which the Company is liable to its insured or a third-party claimant, or that the Company paid as its share of a claim-related extra-contractual obligation awarded against one or more of its co-insurers.

"IBNR" (incurred but not reported) shall mean a reserve for liability for future payment of Losses which have already occurred but have not yet been reported to the Company and shall also include expected future development of reserves for Losses and/or claims reported to the Company which are unpaid at any specified date.

"Insolvency Event" means if the Reinsurer shall at any time (i) become insolvent; or (ii) suffer any impairment of capital; or (iii) file a petition for bankruptcy; or (iv) go into liquidation or rehabilitation; or (v) have a receiver appointed; (vi) in relation to (i) to (v) any analogous procedure or step taken in any jurisdiction.

"Insurance Program" shall mean the insurance program implemented by the Company for the Original Insured in which the Company has agreed to issue or procure the issuance of Policies.

"Losses" shall mean payments or amounts payable by the Company as settlement or in satisfaction of claims for loss under the Policies, including *ex gratia* and without prejudice payments and payments of Extra Contractual Obligations and Excess Limits Liability where such Extra Contractual Obligations and Excess Limits Liability are not finally adjudicated to be the result of gross negligence or fraud by the Company.

"Original Insured" shall mean Goldenstar ~~Insurance~~ Holdings Company SP of Performance Insurance Company SPC and/or its Affiliates and any other companies for whom Goldenstar ~~Insurance~~ Holdings Company SP of Performance Insurance Company SPC may have the right or obligation to procure insurance falling within the Insurance Program.

"Policies" shall mean each policy issued or renewed by the Company to the Original Insured as part of the Insurance Program identified on the Certificate, including any and all binders,



policies and contracts of insurance accepted or held provisionally or otherwise as recorded in the Company's books and records.

"Reinsurer's Obligations" shall mean the Reinsurer's share of 100%, or any higher percentage required by any applicable law, regulation, or regulatory authority, of: (i) Losses and Allocated Loss Expenses paid by the Company, but not recovered from the Reinsurer; (ii) reserves for Losses and Allocated Loss Expenses reported and outstanding; and at the request of the Company (iii) reserves for IBNR; and (iv) unearned premium.

1.2   Throughout this Agreement whenever required by context the use of the singular shall be construed to include the plural, and the use of the plural the singular.

1.3   Any reference in this Agreement to a Party shall either mean the Company or the Reinsurer and any reference to Parties shall mean both the Company and Reinsurer.

1.4   "Including" means "including without limitation" (with related words being construed accordingly) and other general words shall not be given a restrictive interpretation by reason of their being preceded or followed by words indicating a particular class of assets, matters or things.

## ARTICLE II - CESSION AND ASSUMPTION OF REINSURANCE

2.1   Subject to the terms and conditions set forth in this Agreement, whenever the Company agrees to cede to the Reinsurer, the Reinsurer shall accept one hundred percent (100%) of the Company's total liability under the Policies (including Losses and Allocated Loss Expenses) unless otherwise specifically agreed in writing between the Company and the Reinsurer in the Certificate.

2.2   Notwithstanding the preceding paragraph, whenever the Company (a) determines that it is obliged by law or it is otherwise customary to cede reinsurance other than to the Reinsurer or to retain a portion of the liability under the Policies for its own account, or (b) places other reinsurance that had been mutually agreed upon, or (c) other than in situations described in (a) of this Clause 2.2, retains a portion of the liability under the Policies for its own account with the agreement of the Reinsurer, it is understood that the reinsurance ceded to the Reinsurer shall be one hundred percent (100%) of the remaining liability (after the deduction of (a), (b) or (c)) under the Policies as reduced by the amount of such other reinsurance or retention.

2.3   The Agreement covers all risks attaching to any Policies written or renewed during the period of this Agreement.

**ARTICLE III - PERIOD OF AGREEMENT**

Subject to the terms and conditions of this Agreement taking priority in the case of any conflict between this Agreement and the Policies, this Agreement shall be effective from July 1st, 2018 – July 1st, 2019 and will continue in respect of each term of this Agreement, as covered by a Certificate, until terminated pursuant to Article XV or XVI of this Agreement.

**ARTICLE IV - SCOPE OF AGREEMENT**

4.1     The Reinsurer's liability shall attach simultaneously with that of the Company and all reinsurances for which the Reinsurer shall be liable by virtue of this Agreement shall be subject in all respects to the same risks, terms, rates, conditions, interpretations, assessments, waivers, and to the same modifications, alterations and cancellations, as the Policies to which such reinsurances relate, the true intent of this Agreement being that the Reinsurer shall follow the settlements and fortunes of the Company in every case to which this Agreement applies regardless of whether the governing law of the relevant Policy or Policies recognizes a liability or liabilities which would not be recognized (or might be contrary to) the governing law of this Agreement, or whether the governing law of this Agreement applies (or would apply) a different interpretation from that applied by the governing law of the relevant Policies.

4.2     Notwithstanding any other provisions of this Agreement, it is agreed that this Agreement shall apply as reinsurance of any Losses required by law (including statute, regulation or judicial decision) to be covered (or prohibited to be excluded) under the Policies reinsured hereunder. The Reinsurer agrees to follow the settlements and fortunes of the Company in the Reinsurer's agreed share of the Company's liability as stated in this Agreement in such event.

**ARTICLE V – PREMIUM, CEDING COMMISSION AND RUN-OFF FEES**

5.1     The premium payable to the Reinsurer shall be in proportion to the liability under the Policies assumed by the Reinsurer pursuant to Article II of this Agreement less cancellations, returns and amounts specified in Clauses 5.2 and 5.3 of this Article.

5.2     The Reinsurer shall allow the Company an annual ceding commission under this Agreement in an amount as set out in the Certificate pertaining to the annual period for which the ceding commission is due.

5.3     In addition, the Reinsurer shall bear its proportionate share of the following:

   (a)     bureau and board fees, fire brigade charges, stamp duties, premium taxes including any federal excise tax that may apply, or other taxes or charges imposed upon the Company and not recovered from the Original Insured;

   (b)     brokerage, agents' fees, countersignature fees, and any other acquisition costs incurred by the Company and not recovered from the Original Insured;

   (c)     the clams service fee paid or payable by the Company to the Claims Administrator.

5.4     In the event of any return premium, the Reinsurer will deduct the proportionate share of premium taxes, including any federal excise tax, applicable to such return premium and the Company shall be responsible for recovering such taxes from the taxing authority.

5.5     As respects premiums ceded to the Reinsurer, the Reinsurer shall indemnify the Company for any liability, expense, interest or penalty the Company may incur by reason of the violation by the Reinsurer of the United States Internal Revenue Ruling 2008-15, including any modification to such ruling.

5.6     In the event of nonrenewal of the Insurance Program by the Original Insured for any reason other than the Company's A.M. Best rating falling below A-, or in the event of the effective termination of the Policies within the period of insurance, as compensation for the Company's monitoring of collateral requirements and other activities related to this Agreement, the Reinsurer shall pay the Company an annual fee at the rates specified below for each twelve (12) month period following the effective date of termination of coverage under the Policies.

| | |
|---|---|
| First annual fee: | $25,000 |
| Second annual fee: | $20,000 |
| Third annual fee: | $15,000 |
| Fourth annual fee: | $10,000 |
| Fifth and subsequent annual fees: | $15,000 |

The annual fee shall be fully earned as the first day of the twelve (12) month period to which it applies.   The first twelve (12) month period shall commence on the effective date of termination of coverage under the Policies and each successive twelve (12) month period shall commence on the anniversary of such date. The annual fee shall be due and payable to the Company in full within thirty (30) days of commencement of the twelve (12) month period to which the fee applies. If all actual or potential liabilities under the Policies have been either fully and finally settled or assumed pursuant to a novation as of the effective date of termination of coverage under the Policies, or if all of the Reinsurer's present and future obligations under this Agreement have been immediately settled pursuant to Article XVI in

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                                            5



conjunction with a termination of this Agreement, the provisions of this Clause 5.6 shall not apply. If such liabilities have been either fully and finally settled or assumed as of a date occurring after the effective date of termination of coverage under the Policies, the provisions of this Clause 5.6 shall no longer apply; however, any annual fee fully earned for any twelve (12) month period in which the effective date of such settlement or assumption occurs shall not be subject to proration and, if outstanding, shall become immediately due and payable to the Company.

## ARTICLE VI – CLAIMS AND SETTLEMENTS

6.1   The Company shall give the Reinsurer written notice as soon as reasonably practicable of any occurrence, accident, event, or circumstance that in the opinion of the Company will likely involve this Agreement. The Company's failure to provide such notice shall not provide the Reinsurer with a basis for non-payment of any Loss.

6.2   The Company in its sole discretion shall investigate, defend, resolve, adjust, settle or compromise claims or proceedings affecting this reinsurance. While the Reinsurer does not undertake to investigate or defend claims or proceedings, it shall nevertheless have the right and be given the opportunity, at its request and with the cooperation of the Company, to appoint representatives and to become associated, at its own expense, with the Company and the Company's representatives in the investigation or defense of any claims or proceedings involving this Agreement.

6.3   All payments arising from a judgment, settlement, compromise or adjustment of claims under the Policies, including Declaratory Judgment Expenses and those involving coverage issues and/or the resolution of whether such claims or losses are required by law, regulation or regulatory authority to be covered (or not to be excluded), shall be unconditionally binding on the Reinsurer in proportion to its participation regardless of whether such judgment, settlement, compromise or adjustment is in respect of a liability recognized by or contrary to the governing law of this Agreement. Such settlements, compromises, and adjustments shall be evaluated under a standard of good faith rather than a standard of all proper and businesslike steps. Such court or arbitration determination, settlement, compromise, or adjustment shall be considered a satisfactory proof of loss. Upon receipt of the Company's proof of Loss, the Reinsurer shall immediately pay its share of Loss and/or expense paid or due and payable by the Company.

6.4   The Company will enter into a Claims Service Agreement with a Claims Administrator mutually acceptable to the Reinsurer and the Company for the administration of claims arising under the Policies. The Claims Service Agreement will be effective contemporaneously with this Agreement. Any change of Claims Administrator will require mutual agreement of the Company and the Reinsurer.

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                                 6

6.5    In the event of a claim under any of the Policies, the Reinsurer agrees that, if requested by the Company, payment hereunder shall take place at the same time as settlement or advance of funds under the Policies. If the Company incurs an increased Loss amount and/or Allocated Loss Expenses because the Reinsurer fails promptly to pay any amount due under this Agreement, the cost of such increases shall be borne by the Reinsurer notwithstanding any other provision in this Agreement. Without limiting the foregoing, in the event the Reinsurer fails to remit the amount due to the Company within thirty (30) days of the date such payment is due, the Reinsurer will pay to the Company on demand an interest payment computed on the number of days delinquent under the terms of this Agreement at one month dollar LIBOR plus three per cent (3%).

6.6    The date on which any Extra Contractual Obligation and/or Excess Limits Liability is incurred by the Company will be deemed, in all circumstances, to be the date of the original Loss. Nothing in this Article shall be construed to create a separate or distinct loss apart from the original covered Loss that gave rise to the Extra Contractual Obligations and/or Excess Limits Liability discussed in the preceding paragraphs. The Reinsurer's liability as respects Extra Contractual Obligations and/or Excess Limits Liability under this Agreement will be in addition to the indemnification coverage set forth in this Agreement.

6.7    In the event there is no Loss other than Declaratory Judgment Expenses with respect to the Policies, such expenses shall be deemed Loss for purposes of this Agreement.

6.8    The Reinsurer will be paid or credited by the Company with its proportion of subrogation and/or salvage, namely, reimbursement obtained or recovery made by the Company, less the actual cost (excluding internal office expenses and salaries of the Company's employees) of obtaining such reimbursement or making such recovery. In any event, the Company and the Reinsurer shall share in the expenses of any unsuccessful subrogation or salvage efforts in the same proportion that the Company and the Reinsurer shared in Loss giving rise to such subrogation or salvage efforts.

6.9    Unless otherwise provided in this Agreement, the treatment of Allocated Loss Expenses shall follow form with the Policies. If expense is included within the limits of the Policies: (i) the Original Insured's retention shall be satisfied by Losses and/or Allocated Loss Expenses; and (ii) the reinsurance limit(s) stated herein, if any, shall be exhausted by Losses and/or Allocated Loss Expenses. If expense is payable in addition to the limits of the Policies: (i) the Original Insured's retention shall be satisfied only by Losses; (ii) the reinsurance limits shall be exhausted only by Losses; and (iii) Allocated Loss Expenses shall be payable by the Reinsurer in addition to the reinsurance limits. The Reinsurer shall pay its proportionate share of all Loss and Allocated Loss Expenses.

**ARTICLE VII - SETTLEMENT OF ACCOUNTS**

7.1     The Company shall render accounts to the Reinsurer as soon as practicable showing the following:

     (a)     Premium credited to the Reinsurer;

     (b)     Taxes and other items, as provided in Article V, debited to the Reinsurer;

     (c)     Losses paid debited to the Reinsurer, if any;

     (d)     Ceding Commission and fees, as provided in Article V, debited to the Reinsurer;

     (e)     Reserves as provided in Article X, due to or from the Reinsurer;

     (f)     Any other amounts that may be properly debited or credited to either Party during the period for which the account is rendered.

7.2     The Company agrees to remit premiums due to the Reinsurer as soon as practicable after the Company's receipt of same.

## ARTICLE VIII - CURRENCY

8.1     The Master Currency under this Agreement shall be US Dollars.

8.2     Premiums due to the Reinsurer hereunder shall be paid in the Master Currency. In respect of premiums received by the Company in any other currency, the rate of exchange used for conversion into the Master Currency shall be that applying to the account into which the Company's administrator (as identified in the Certificate) receives that premium as at the date on which the administrator receives the premium.

8.3     Amounts due from the Reinsurer for any Loss shall, where necessary, be converted into the Master Currency at the same rate of exchange as was applied in the settlement of the Loss under the Policy. If no conversion was done at that time, the rate of exchange to be applied shall be that used by the Company's administrator in its own books either at the time of settlement of a Loss by the Reinsurer or in accordance with any subsequent adjustment thereto.

8.4     Amounts recovered by or on behalf of the Company and payable to the Reinsurer hereunder through salvage, subrogation or otherwise in respect of any Loss or damage, shall be paid in the Master Currency. Such amounts shall be converted into the Master Currency from the currency in which the Company receives such amounts at the rate of exchange applying to the account into which the Company's administrator receives payment of that amount as at the date on which the administrator receives such amount.

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                  8



8.5    Loss or gain arising from any fluctuation in exchange rate relating to any currency conversion shall be borne by and for the account of the Reinsurer.

## ARTICLE IX – CREDIT FOR REINSURANCE SECURITY

9.1    The Reinsurer shall secure the Reinsurer's Obligations by one or more of the following methods, which the Reinsurer shall select at its option:

    (a)    funds withheld: funds otherwise due to the Reinsurer under this Agreement that are subject to withdrawal, transfer, or substitution solely by the Company and held under its exclusive control; or

    (b)    letters of credit: one or more clean, irrevocable, and unconditional evergreen letters of credit issued by a bank or banks acceptable to the Company in its sole discretion that meet the requirements of any applicable law, regulation, or regulatory authority, and, in any event, would permit the Company and all members of its intercompany pool, if any, to take credit for reinsurance in their respective states of domicile assuming the Reinsurer were an unauthorized Reinsurer in such states; or

    (c)    reinsurance trust account: funds deposited pursuant to a trust agreement in form and substance, and with a third party trustee, in each case satisfactory to the Company in its sole discretion that meets the requirements of any applicable law, regulation, or regulatory authority, and, in any event, would permit the Company and all members of its intercompany pool, if any, to take credit for reinsurance in their respective states of domicile assuming the Reinsurer were an unauthorized Reinsurer in such states.

In the event that the Reinsurer at any time fails to meet its security obligations as set forth in this Article, the Company shall be entitled to hold back, as funds withheld, any amounts otherwise due to the Reinsurer under this Agreement or any other agreement between the Company and the Reinsurer.

9.2    The initial amount of security required under this Article shall be $500,000.  The amount of security shall be adjusted by the Company periodically, but not more frequently than quarterly, in order to provide for security in an amount sufficient to secure the Reinsurer's Obligations.

9.3    Notwithstanding any other provision of this Agreement, any letters of credit may be drawn upon and/or assets in any reinsurance trust account may be withdrawn by the Company (including any liquidator, rehabilitator, receiver, conservator, or other successor of the Company by operation of law) at any time: (i) to reimburse the Company for the Reinsurer's share of returned premiums upon Policy cancellation; (ii) to satisfy any of the Reinsurer's Obligations under this Agreement which are then due under this Agreement and are unpaid;

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                                  9



(iii) to pay any other amount the Company claims is due under this Agreement; (iv) in the event that the Company receives notice of nonrenewal of any letter of credit or termination of any trust agreement; or (v) as funds withheld for the Reinsurer's Obligations under this Agreement. Additionally, any funds withheld may be applied as respects items (i) – (v) above.

9.4    Prior to depositing any assets into a reinsurance trust account, the Reinsurer shall execute assignments or endorsements in blank, or transfer legal title of such assets to the trustee, so that the Company, or the trustee upon the Company's direction, may negotiate any such assets without the consent or signature of the Reinsurer or any other entity. Notwithstanding the composition of assets in any trust account, all settlements of account between the Company and the Reinsurer shall be in cash or its equivalent.

9.5    Unless the Reinsurer shall be in default of any provision of this Agreement, simple interest shall be credited to the Reinsurer on funds withheld each time the Reinsurer's Obligations are adjusted at the one-year LIBOR rate for U.S. Dollars then in effect.

9.6    The Company may, at its discretion, require payment of any sum in default instead of resorting to any security held, and it shall be no defense to any such claim that the Company might have had recourse to any such security.

9.7    For purposes of this Article the phrase "any applicable law, regulation, or regulatory authority" shall include but not be limited to all laws and regulations affecting the ability of the Company and all members of its intercompany pool, if any, to take credit for reinsurance.

9.8    The Reinsurer agrees to take other commercially reasonable actions that are necessary to allow the Company to receive full credit under any applicable law, regulation or regulatory authority for the reinsurance provided under this Agreement.

9.10    The Reinsurer's duty to provide security as stated above will extend until the Company is satisfied that the Reinsurer's Obligations under this Agreement have been and will be met. The Reinsurer recognizes that this duty may continue after this Agreement terminates or is cancelled.

9.11    If the Company or any successor to the Company by operation of law shall draw on the security, the Company or such successor shall use and apply any and all proceeds of such security solely for the purpose of satisfying the Reinsurer's Obligations hereunder.

9.12    The Reinsurer shall provide annually to the Company a certified copy of the Reinsurer's latest financial statement as filed with the applicable financial regulatory authority in its domicile jurisdiction.  The Company will keep such statement confidential and shall use it solely for the purpose of evaluating the amount of security required under this Agreement.

9.13    The Reinsurer shall provide annually to the Company evidence that it is in good standing with the applicable governmental regulatory agencies.  The Reinsurer also agrees to provide at least ninety (90) days prior written notice to the Company of any significant changes in the Reinsurer's operations or in business undertaken by the Reinsurer that would interfere with the Reinsurer's ability to meet its obligations hereunder and if it intends to write third party business and shall provide the Company with all particulars thereof.

## ARTICLE X - RESERVES

10.1    Upon request of the Company, the Reinsurer agrees to promptly deliver to the Company funds equal to the premium and Loss reserves as may be required by competent regulatory authorities.  The funds shall be in the currency or collateral instrument such authority may require or customarily accept.  It is understood and agreed that the term "competent regulatory authorities" includes such authorities in the Company's country of incorporation. The Company shall use its commercially reasonable efforts to release reserves as soon as possible.  Reserves retained and released shall be debited/credited in accordance with Article VII. The Company will pay to the Reinsurer interest on reserves retained, such interest to be computed at the rate equal to one month dollar LIBOR less half (0.5) of one percent as of the date such reserves are retained by the Company.

10.2    In the event of termination of this Agreement, the Company, to the extent permitted by law, shall utilize such retained reserves for payment of Losses before calling upon the Reinsurer to remit its share of said Losses.

10.3    The Reinsurer will show the Company that it is recording appropriate reserves on its books with respect to outstanding Losses, IBNR, Allocated Loss Expenses and unearned premium.

## ARTICLE XI - ACCESS TO RECORDS

11.1    The Reinsurer, or its duly authorised representative, shall upon written request have access at all reasonable times during and after the term of this Agreement, until such time as the obligations of the Company and the Reinsurer hereunder are fully and finally satisfied, to the books and records of the Company in connection with the reinsurance provided hereunder. Inspection of books and records under this Article shall be made during normal business hours following fifteen (15) days prior written notice, which notice shall include the details and initial scope of the inspection.  Inspection shall be conducted without undue interference to the Company's business activities and in accordance with reasonable industry practices.

11.2    Notwithstanding anything to the contrary above, the Company reserves the right to withhold any documents from the Reinsurer that in the Company's judgement are protected by any applicable privileges and doctrines and will notify the Reinsurer in the event any such documents are withheld.

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.



11.3    Promptly, but no later than thirty (30) calendar days after completion of its review, the Reinsurer shall consult with the Company with respect to any and all questions or issues raised by the inspection.  If, as a result of the Reinsurer's inspection, any claim is denied, contested or disputed, the Reinsurer shall, upon the Company's request, promptly provide the Company with a copy of any reports or analysis completed by the Reinsurer or its representatives outlining the findings of the inspection and identifying the reasons for denying, contesting or disputing such claim.

11.4    The Company, or its duly authorized representative, shall have a right to access and inspect the books and records of the Reinsurer on the same terms and conditions as apply under this Article to the Reinsurer's right to access and inspect the Company's books and records.

## ARTICLE XII - ERRORS AND OMISSIONS

Any inadvertent clerical delay(s), omission(s) or error(s) made shall not release either Party from any liability that  would attach to it if such delay(s), omission(s) or error(s) had not been made, provided that such delay(s), omission(s) or error(s) are rectified as soon as practicable upon discovery.

## ARTICLE XIII – ARBITRATION

13.1    Any and all disputes or differences arising out of this Agreement, including its formation and validity, shall be submitted to binding arbitration. Any arbitration shall be based upon the Procedures for the Resolution of U.S. Insurance and Reinsurance Disputes dated September 2009, Regular Panel Version (the "Procedures"), as supplemented by the paragraphs below.

13.2    The Panel shall consist of three disinterested arbitrators, one to be appointed by the Petitioner, one to be appointed by the Respondent and the third to be appointed by the two party-appointed arbitrators. The third arbitrator shall serve as the umpire, who shall be Neutral. The arbitrators and umpire shall be persons who are current or former officers or executives of an insurer or reinsurer. Within 30 days of the commencement of the arbitration proceeding, each Party shall provide the other Party with the identification of its party-appointed arbitrator, his or her address (including telephone, fax and e-mail information), and provide a copy of the arbitrator's curriculum vitae. If either Party fails to appoint an arbitrator within that 30-day period, the non-defaulting Party will appoint an arbitrator to act as the party-appointed arbitrator for the defaulting party. The umpire shall be appointed by the two party-appointed arbitrators as soon as practical (but no later than 30 days) after the appointment of the second arbitrator. The Party-appointed arbitrators may consult, in confidence, with the Party who appointed them concerning the appointment of the umpire.

13.3    Where the two party-appointed arbitrators have failed to reach agreement on an umpire within the time specified above, each Party shall propose to the other in writing, within seven days

thereafter, eight umpire candidates from the ARIAS·U.S. Certified Arbitrators List in effect at the time of the commencement of the arbitration. The umpire will then be selected in accordance with paragraph 6.7(b)-(c) of the Procedures. (Unless the Parties agree otherwise, the ARIAS·U.S. Umpire Questionnaire Form in effect at the time of the commencement of the arbitration shall be used.)

13.4   The arbitration shall take place in New York, New York.

13.5   Unless prohibited by law, the Supreme Court of the State and County of New York and the United States District Court for the Southern District of New York shall have exclusive jurisdiction over any and all court proceedings that either Party may initiate in connection with the arbitration, including proceedings to compel, stay, or enjoin arbitration or to confirm, vacate, modify, or correct an Arbitration Award. In addition, the COMPANY shall have the right to seek and obtain in such courts provisional relief prior to the panel being fully formed pursuant to this Article, including prior to the commencement of the arbitration proceeding.

13.6   For purposes of this Article, the terms "Arbitration Award," "Disinterested," "Notice of Arbitration," "Panel," "Party" (or "Parties"), "Petitioner," "Respondent," and "Response" shall have the meanings set forth in article 2 of the Procedures (Definitions).

13.7   In the event of any conflict between the Procedures and this Article, this Article, and not the Procedures, will control.

13.8   This Article shall survive the termination of this Agreement.

## ARTICLE XIV - INSOLVENCY

14.1   If the Reinsurer shall become insolvent, the Reinsurer shall give or shall cause the liquidator or receiver or statutory successor of the Reinsurer to give immediate written notice of such insolvency to the Company.  If the Reinsurer shall become insolvent, the Company shall have the right to offset any amounts (whether on account of premium, commissions or otherwise) that are owing to the Reinsurer from the Company under this Agreement or under any other agreement heretofore or hereafter entered into, against any and all amounts then owing to the Company from the Reinsurer.

14.2   In the event of the insolvency of the Company, this reinsurance shall be payable directly to the Company, or to its liquidator, receiver, conservator, or statutory successor immediately upon demand on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator, or statutory successor of the Company has failed to pay all or a portion of any claim. It is agreed, however, that the liquidator, receiver, conservator, or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company which would involve a possible liability on the part of the Reinsurer, indicating the Policy or bond reinsured, within a reasonable time after such claim is filed in the conservation or

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                        13



liquidation proceeding or in the receivership. It is further agreed that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Company or its liquidator, receiver, conservator, or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

14.3    The reinsurance shall be payable by the Reinsurer to the Company or to its liquidator, receiver, conservator, or statutory successor, except: (a) where this Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company; (b) where the Reinsurer with the consent of the Original Insured assumes the obligations of the Company under the Policy as direct obligations of the Reinsurer to the Original Insured or payees under the Policy and in substitution for the obligations of the Company to the Original Insured or payees under the Policy; or (c) where provided otherwise under applicable law. Then, with the prior approval of the applicable regulatory authority, if required, the Company is entirely released from its obligation and the Reinsurer shall pay any Loss directly to payees under the Policies.

## ARTICLE XV - TERMINATION

15.1    Neither the Company nor the Reinsurer may terminate this Agreement while the Policies are in force; however, if such Policies are effectively terminated, then in that event this Agreement may be terminated by the Company simultaneously therewith.

15.2    As respects coverage hereunder, it is understood and agreed that upon termination of this Agreement, coverage will continue hereunder beyond such termination date until the natural expiration date, the cancellation date, or the date which the Company, as a matter of law, may terminate coverage under the Policies.

15.3    Should this Agreement terminate while a loss occurrence is in progress, the Reinsurer shall be liable to the extent of its interest, subject to the other conditions of this contract, for all Losses resulting from such loss occurrence whether such Losses arise before or after such termination.

15.4    Notwithstanding the above cancellation provisions, it is a condition of this Agreement that in the event of termination of this Agreement and, if subsequent thereto, either of the following occurs:

(a)    claims arising from the Policies which had been reported and closed prior to the termination of this Agreement are reopened; or

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                              14

(b)    claims arising from the Policies allegedly incurred within the period of insurance but not reported prior to the termination of this Agreement are made upon the Company within the time limitations contained in the Policies or the time limitations imposed by the laws of the country of the risk giving rise to the claims;

then this Agreement shall be automatically reinstated and shall continue in full force and effect until such claims have been closed.

## ARTICLE XVI – SPECIAL TERMINATION

16.1   Notwithstanding anything to the contrary in this Agreement, the Company shall have the right, but not the obligation, to terminate this Agreement immediately by giving the Reinsurer notice in writing:

(a)    if the Reinsurer is subject to an Insolvency Event;

(b)    if the Reinsurer is acquired or becomes controlled by any entity not affiliated with it at the time this Agreement is entered into;

(c)    If the performance of the whole or any part of this Agreement be prohibited or rendered impossible de jure or de facto in particular and without prejudice to the generality of the preceding words in consequence of any law or regulation which is or shall be in force in any country or territory or if any law or regulation shall prevent directly or indirectly the remittance of any or all or any part of the balance of payments due to or from the Reinsurer;

(d)    In the event of the severance or obstruction of free and unfettered communication and/or normal commercial and/or financial intercourse between the country where the Original Insurer or the Reinsurer is incorporated and the country in which the Company is incorporated or has its principal office as a result of war, currency regulations, or any circumstances arising out of political, financial or economic emergency; or

(e)    In the event that the Reinsurer fails to satisfy any obligation under this Agreement, including its obligation to provide security when requested, and does not cure such failure within ten (10) days of the Company's notice to the Reinsurer of such failure.

16.2   If the Company terminates this Agreement in accordance with Clause 16.1, the Company will have the option of (i) immediate settlement of all of the Reinsurer's present and future obligations under this Agreement, or (ii) termination on a run-off basis and, in such event, the Reinsurer shall secure all present and future obligations under this Agreement through a trust

account or letter of credit in accordance with Article IX.  In the event of an immediate settlement of all present and future obligations, upon the Company's receipt of final payment, the Company and the Reinsurer shall execute a full and final commutation and mutual release of their respective liabilities under this Agreement.  When requested by either Party an appraisal of IBNR shall be made by a disinterested actuary appointed by the Company. Should the parties proceed with such an actuarial evaluation, such evaluation shall assess which of the parties' two results is the more reasonable calculation in light of the evidence provided by both parties in support of their calculations. Thirty (30) days after the commencement of this evaluation process, the disinterested actuary shall pick one and only one of the results from the two parties and this result shall be binding on both Parties.

## ARTICLE XVII – NOTICES

For any notice under this Agreement, including any notice of termination, the following addresses shall be used:

**Lexington Insurance Company**
Joseph Davina, Vice President
175 Water Street, 26th Floor
New York, NY 10038

Goldenstar Insurance Holdings
**Company SP of Performance
Insurance Company SPC**
Beth Biega, Vice President
Whitehall House, 3rd Floor
238 North Church Street
Grand Cayman, KY1-1107
Cayman Islands

For informational purposes, a copy of any such notice shall also be delivered, in the same manner as the original, to the attention of the President of Multinational, 80 Pine Street, 36th Floor, New York, NY 10005 United States.

## ARTICLE XVIII – GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflicts of law principles.

## ARTICLE XVIX – SERVICE OF SUIT

19.1    At the request of the Company, the Reinsurer agrees to submit to the jurisdiction of any court of competent jurisdiction within the State of New York and agrees to comply with the requirements necessary to give the court jurisdiction with respect to any and all court proceedings that the Company may initiate in connection with an arbitration, including proceedings to compel, stay or enjoin arbitration or to confirm, vacate, modify or correct an arbitration award.  Nothing in this Clause constitutes or should be understood to constitute a waiver of the rights of the Reinsurer to remove such an action to a United States District Court, or to seek a transfer of such a case to another court as permitted by the laws of the United States or of any state in the United States, or to commence an action in connection

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                    16

with the arbitration in any court of competent jurisdiction in the United States. It is further agreed that service of process on the Reinsurer in such suit may be made upon the United States District Court for the Southern District of New York and that, in any suit instituted against the Reinsurer under this Agreement, the Reinsurer will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

19.2    Solomon Harris, located at 53 Market Street, Camana Bay, P.O. Box 1990, Grand Cayman KY1-1104, Cayman Islands is authorized and directed to accept service of process on behalf of the Reinsurer in any such suit and/or upon the request of the Company to give a written undertaking to the Company that they will enter a general appearance on the Reinsurer's behalf in the event such a suit shall be instituted.

19.3    Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer also hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement, and hereby designates a yet to be determined firm or such other entity as designated, as the entity to whom the said officer is authorized to mail such process or a true copy thereof.

19.4    This Article shall not be read to conflict with or override the obligation of the Parties to arbitrate any and all disputes or differences arising out of this Agreement.

## ARTICLE XX – SEPARATE OBLIGATIONS

The rights and obligations of each entity constituting the Company under this Agreement are several, not joint, and no breach by one entity shall affect the rights of any other entity under this Agreement.

## ARTICLE XXI - SEVERABILITY

21.1    If any provision of this Agreement shall be rendered illegal or unenforceable by the laws, regulations or public policy of any jurisdiction, such provision shall be considered void in such jurisdiction, but this shall not affect the validity or enforceability of any other provision of this Agreement or the enforceability of such provision in any other jurisdiction.

21.2    The parties shall negotiate in good faith to attempt to agree to amend such provision so that it will comply with the law, regulations and public policy of the jurisdiction in which it was rendered illegal or unenforceable in order to effectuate the parties' original intent.

## ARTICLE XXII - ENTIRE AGREEMENT; INTERPRETATION

This Agreement constitutes the entire agreement between the Parties, and there are no understandings or agreements between the Parties other than those expressed in this Agreement. Any change to or modification of this Agreement will be made by written amendment to this Agreement and signed by the Parties hereto. This Agreement is between sophisticated parties, each of which has reviewed the Agreement and is fully knowledgeable about its terms and conditions. The Parties therefore agree that this Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor or either of them.

## ARTICLE XXIII – OFFSET

Each Party hereto shall have, and may exercise at any time and from time to time, the right to offset any undisputed balance or balances, whether on account of premiums or on account of Losses or otherwise under this Agreement. In the event of the insolvency of a Party hereto, offsets shall be allowed to the fullest extent of the provisions of applicable law, provided, however, that, in the event of the insolvency of a Party reinsured hereunder that is domiciled in the United States, offset shall only be allowed in accordance with the provisions of Section 7427 of the Insurance Law of the State of New York. For purposes of this Article, balances will be considered "disputed" if one Party has contested the balance in writing to the other Party.

## ARTICLE XXIV – MODE OF EXECUTION

24.1    Unless otherwise required by law or regulation, this Agreement may be executed by:

   (a)    an original written ink signature of the Agreement;

   (b)    an exchange of facsimile copies showing the original signature of the Agreement; or

   (c)    electronic signature technology employing computer software and a digital signature or digitizer pen pad to capture a person's handwritten signature in such a manner that the signature is unique to the person signing, is under the sole control of the person signing, is capable of verification to authenticate the signature and is linked to the document signed in such a manner that if the data is changed, such signature is invalidated.

24.2    Unless otherwise required by law or regulation, the use of any one or a combination of these methods of execution shall constitute a legally binding and valid signing of this Agreement. This Agreement may be executed in one or more counterparts, each of which, when duly executed, shall be deemed an original.

## ARTICLE XXV – CONFIDENTIALITY

25.1.   All terms and conditions of this Agreement and any materials provided in connection therewith (the "Material") shall be kept confidential by the Parties as against third parties for a period of three (3) years after all of the Parties' contractual obligations hereunder are fully and finally satisfied.

25.2   The Parties shall be permitted to disclose this Agreement and any Material to their consultants, attorneys, auditors and (in the case of the Reinsurer) retrocessionaires (collectively, "Representatives") provided the Parties advise their Representatives of the confidential nature of the Material, and their obligation to maintain its confidentiality. The Parties shall be responsible for any breach of this provision by any of its respective Representatives.

25.3   The Parties shall also be permitted to disclose Material that:

    (a)   is properly in the possession of the Party at the time of disclosure without any obligation of confidentiality attaching thereto;

    (b)   is or becomes available to the general public without breach of this Agreement;

    (c)   is disclosed to the Party by another source that, to the knowledge of the receiving Party, is not in breach of any agreement with the other Party; or

    (d)   is independently developed by the Party without use of or reliance upon the Material.

25.4   The Material provided by the one Party to the other Party or its Representatives and any reports derived therefrom shall be used by the Party and its Representatives only for purposes relating directly to the other Party's rights and obligations under this Agreement.

25.5   Nothing herein shall prohibit a Party from disclosing this Agreement and any Material provided in connection therewith pursuant to a court order or a governmental directive requiring disclosure.  Such disclosure shall be limited, however, to the minimum disclosure necessary. In the event a Party is made aware of an effort by any entity to obtain a court order or governmental directive requiring disclosure of the Material, that Party shall promptly notify the other Party to the extent not prohibited by applicable law and afford it an opportunity, to the full extent possible and at the its expense, to make any objections or challenges to the disclosure sought as the Party may deem appropriate.  If a Party objects to or challenges disclosure, the other Party will take reasonable measures to cooperate with the objecting Party, at the objecting Party's expense, in its efforts to resist such disclosure.

25.6 The Parties shall be entitled to seek equitable relief, including, without limitation, injunctive relief and specific performance, in the event of any breach of the provisions of this Article by the other Party or its Representatives, in addition to all other remedies available at law or in equity.

## ARTICLE XXVI – NON WAIVER

The failure of the Company or the Reinsurer to insist on compliance with this Agreement or to exercise any right or remedy hereunder shall not constitute a waiver of any right or remedy contained in this Agreement, prevent either Party from thereafter demanding full and complete compliance, or prevent either Party from exercising such right or remedy in the future.

## ARTICLE XXVII - SURVIVAL

The provisions of this Agreement shall survive the termination or expiration of this Agreement.

**IN WITNESS WHEREOF**, the Parties, each by its duly authorised representative, have executed this Agreement as set forth below.

GOLDENSTAR ~~INSURANCE~~ *HOLDINGS* COMPANY SP of PERFORMANCE INSURANCE COMPANY SPC

By: _Bella Biega_

Name: _Beth Biega_ (Print)

Title: _Authorized Signature_

Date: _10/27/19_

LEXINGTON INSURANCE COMPANY

By: _[signature]_

Name: _Joseph Davina_ (Print)

Title: _Vice President_

Date: _8/17/18_

SCHEDULE NO. I –
CERTIFICATE OF REINSURED COVERAGES
(this "Certificate")

This Certificate confirms that the coverages issued, ceded (and/or retroceded) by the Company to the Reinsurer relative to the Original Insured under the Reinsurance Agreement effective July 1st, 2018 – July 1st, 2019 (the "Agreement") of which this Certificate is part are issued for the term stated below.   The terms and conditions of the Agreement providing reinsurance by the Reinsurer in favor of the Reinsured shall apply to the cession of such issued] coverages and remain unchanged except as described herein. This Certificate shall be effective as of the Effective Date below, and shall run concurrently with the effective dates of the ceded (and/or retroceded) coverages.

1. **Reinsurer:** Goldenstar ~~Insurance~~ Holdings Company SP of Performance Insurance Company SPC

2. **Company:**       LEXINGTON INSURANCE COMPANY and its successors and assigns.

3. **Claims Administrator:** Health Special Risk, Inc. (upon formal approval)

4. **Policy Number:** Provided to Lexington

5. **Policy Limits:** Various, per schedule provided

6. **Original Insured:**   Goldenstar Insurance (US firm) and/or its subsidiary or Affiliated companies and others for whom these corporations may have the right or obligation to insure

7. **Effective Date for original Policies:** July 1st, 2018   **Expiration Date:** July 1st, 2019

8. **Reinsurance Coverage:** Except as stated otherwise in this Certificate or elsewhere in the Agreement, reinsurance coverage and terms shall be on a risks attaching basis and shall be concurrent with all Policies issued by the Reinsured effective on or after the Effective Date.

9. **Reinsured's Ceding Commission:**     **5% with minimum of $200,000**

10. **Security Requirements:**      **$500,000 LOC plus security of captive assets**

Signed and Accepted by:

By: LEXINGTON INSURANCE COMPANY

By: _____

Name: _Joseph Davina_ (Print)

Title: _VP_

Date: _8/17/18_

GOLDENSTAR ~~INSURANCE~~ Holdings
COMPANY SP

By: _Beth Biz_

Name: _Beth Biega_ (Print)

Title: _Authorized Signatory_

Date: _6/27/19_

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                    21

## MEDICAL CONTRACTOR DISCLOSURE ENDORSEMENT

Effective July 1st, 2018

(this "Endorsement")

to the

### FACULTATIVE REINSURANCE AGREEMENT

Effective July 1st, 2018

(this "Agreement")

between **LEXINGTON INSURANCE COMPANY,** and certain subsidiary and Affiliated companies of American International Group, Inc. and their respective successors and assigns (collectively, the "**Company**"), and Goldenstar ~~Insurance~~ Company SP of Performance Insurance Company SPC (the "**Reinsurer**"). Holdings

Solely with respect to Policies the Parties hereto agree as follows:

### MEDICARE CONTRACTOR DISCLOSURE:

In the event that the Secretary of Health and Human Services or the Comptroller General of the United States or their representatives determine that this Agreement is a contract described in Section 1861(v)(1)(I) of the Social Security Act, 42 U.S.C. § 1395x(v)(1)(I), the Company agrees that until the expiration of four years after the furnishing of services pursuant to this Agreement, the Company shall make available, upon written request, to the Secretary of Health and Human Services, or upon request, to the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and all books, documents, and records of the Company that are necessary to certify the nature and extent of costs paid to the Company pursuant to this Agreement. If the Company carries out any of the duties of this Agreement through a subcontract, with a value or cost of $10,000 or more over a twelve-month period, with a related organization as defined in 42 C.F.R. § 413.17, such subcontract shall contain a provision to the effect that until the expiration of four years after the furnishing of such services pursuant to such subcontract, the related organizations shall make available, upon written request to the Secretary of Health and Human Services or upon request to the Comptroller General of the United States, or any of their duly authorized representatives, the subcontract, and all books, documents, and records of such organizations that are necessary to verify the nature and extent of such costs. In the event access to books, documents, and records is requested pursuant to this paragraph, the Company shall immediately notify the Reinsurer, and the books, documents, and records shall also be made available to the Reinsurer.

GLOBAL CAPTIVE FAC. RIA – US LAW AND ARB.
REV. 2013                                     22



# Exhibit 6

**From:** Brandon White [mailto:brandon.white@ambassadorcaptive.com]
**Sent:** Tuesday, December 03, 2019 3:05 PM
**To:** Benz, Mark
**Cc:** Darin Smith  Davina, Joseph
**Subject:** [E  TERNAL] Re: Goldenstar Holdings Company SP

This message is from an e  ternal sender  be cautious with links and attachments.

Mark & Joe,

I apologize for this misrepresentation. We are working to track down the genesis of this document. I can assure you that this did not come from Ambassador in any way. This is not acceptable to us and we will get to the bottom of this and commit to return and report. I am sorry that I do not know more at this moment but didn't want to remain silent on this matter.

This partnership is important to us and we would not jeopardize it. More to come.

Sincerely,

Brandon M. White, CIC, CRM
Founder/President
Ambassador Captive Solutions
9700 Park Plaza Avenue, Suite 201
Louisville, KY 40241
502.439.1555
www.ambassadorcaptive.com

"Out of clutter, find simplicity.   - Einstein


On Dec 3, 2019, at 12:52 PM, Benz, Mark wrote:


Gentlemen,

We need to know where this document came from **ASAP.** This is the second time within the past year there has been some type of misrepresentation in our workings. If we can't get an explanation as to how this occurred, we will proceed to non-renew both captives effective 2020 and report this occurrence to the proper regulatory body to protect AIG's interests.

Regards,

Mark

**Mark   en**

**AIG**
Senior   ice President

Lexington Insurance Company | Group Captives

175 Water Street, 26th Floor, New York, NY 10038

T   1 212-458-3393 | M   1 646-592-1309
Mark.Benz@aig.com | www.aig.com

**AIG 1     | Celebrating 1        ears: Visit 1    .aig to learn more.**

**From:** Davina, Joseph
**Sent:** Monday, December 02, 2019 6:52 PM
**To:** Beth Biega
**Cc:** Doug King  Brandon White  Darin Smith
**Subject:** RE: Goldenstar Holdings Company SP

Hi Beth,

This was never signed by me so not sure how you have a fully executed agreement that I never signed. If you want to see my handwriting and signature it is much nicer than that. Please stop sending over forged documents. This is the 2nd time AIG has been sent forged documentation including an email supposedly written by me over a year ago that was never sent from my email.

Brandon/Darin,

I'd suggest figuring out what this document is and a very good explanation of it before I go to my legal counsel at AIG to figure out what this is. I took Chris Flatt off of this response to give you time to figure this out. I'm in Cayman and we can talk about this tomorrow at 10am. This is completely unacceptable and   uite frankly a relationship breaker if not resolved ASAP. I will go to my Executive leadership if I don't have a full response and explanation by EOD tomorrow.

Joe


**Joseph Davina**

**AIG**
 ice President
Lexington Insurance Company | Group Captives

175 Water Street, 26th Floor, New York, NY 10038

T: 646-857-1345 | M: 917-224-3451
joseph.davina@aig.com | www.aig.com



**From:** Beth Biega [mailto:BBiega@atlascaptives.com]
**Sent:** Tuesday, November 19, 2019 12:24 PM

2

**To:** Davina, Joseph  Flatt, Christopher J
**Cc:** Doug King  Brandon White  Darin Smith
**Subject:** [E  TERNAL] Goldenstar Holdings Company SP

**This message is from an e  ternal sender  be cautious with links and attachments.**

Dear Joe,
Attached please find the fully executed Facultative Reinsurance Agreement. Please provide wiring instructions for the commission payment.

Kind regards,
Beth

Beth Biega
*Vice President*

Whitehall House, 3rd Floor, 238 North Church Street

PO Box 699, Grand Cayman, KY1-1107, Cayman Islands

Tel:  1 345-945-5556

Fax:  1 345-945-5557

Skype: bethbiega

www.atlascaptives.com                    bbiega@atlascaptives.com

Anguilla | Bahamas | Cayman Islands | Nevis | D.C. | Delaware | Georgia | Montana | North Carolina | Oklahoma | South Carolina | Tennessee | Texas |   tah

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender immediately and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*